

NUMBER 13-09-00179-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RICHARD MICHAEL RECKART,                                         Appellant,

v.

THE STATE OF TEXAS,                                                 Appellee.

On appeal from the 36th District Court
of San Patricio County, Texas.

# O P I N I O N

### Before Justices Rodriguez, Benavides, and Vela
### Opinion by Justice Benavides

Appellant, Richard Michael Reckart, appeals his conviction for continuous sexual abuse of a young child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 21.02 (Vernon Supp. 2009). Reckart was sentenced to thirty years' imprisonment in the Texas Department of Criminal Justice—Institutional Division and was assessed court costs. By

seven issues, Reckart argues that: (1) the trial court erroneously admitted evidence of alleged extraneous acts; (2) the trial court's admission of uncorroborated outcry testimony violated his right to due process; (3) the evidence is legally and factually insufficient to support the conviction; (4-5) section 21.02 of the Texas Penal Code violates his right to an impartial jury because it allows the jury to reach a decision by not considering every element of the entire allegation; (6) section 21.02 violates the Eighth Amendment to the United States Constitution; and (7) section 21.02 is unconstitutional because it shifts the burden of proof to a standard that is less than "beyond a reasonable doubt." We affirm.

## I. BACKGROUND

On December 2, 2008, Reckart was indicted for continuous sexual abuse of R.R., a child then younger than fourteen years of age, that allegedly occurred from September 1, 2007 through April 30, 2008. The indictment alleged that Reckart: (1) intentionally or knowingly caused the penetration of R.R.'s sexual organ by his sexual organ; (2) intentionally or knowingly caused the penetration of R.R.'s sexual organ by his finger; (3) intentionally or knowingly caused the penetration of R.R.'s mouth by his sexual organ; and (4) knowingly or intentionally caused R.R.'s sexual organ to contact his mouth. *See id.*

On January 23, 2009, Reckart filed a motion to quash the indictment and to dismiss the case, arguing that Texas Penal Code section 21.01 is unconstitutional and conflicts with Texas law because it allows a jury to find a defendant guilty without requiring the jury to unanimously agree as to which acts of sexual abuse the defendant committed within the relevant time frame. *Id.* § 21.02(d). Reckart argued that the statute violates the right to an impartial jury under the United States and Texas Constitutions, the presumption of innocence under Texas Code of Criminal Procedure article 38.03, and the due process and

2

equal protection clauses of the United States Constitution. *See* U.S. CONST. amend. V, VI, XIV; TEX. CONST. art. I, § 15; TEX. CODE CRIM. PROC. ANN. art. 38.03 (Vernon Supp. 2009). After a hearing, the trial court denied Reckart's motion to quash the indictment and to dismiss. The case was tried before a jury.

## A. The State's Case-in-Chief

The State's first witness, M.R., testified that in 2004, she met Reckart and began dating him. M.R. and her three children, R.R., R.A.R., and R.R.R., moved into a home in Ingleside with Reckart, Reckart's daughter T.V., and another person named Michael Geizer.

In August 2007, M.R., her family, and Reckart moved to Portland. M.R. testified that when they lived in Portland, she worked two jobs; Reckart cared for the children while she was at work. After the family moved to Portland, M.R. noticed that her daughter R.R. became vocal about "hating" Reckart. R.R. would ask M.R. if she could accompany her to work. On cross-examination, M.R. testified that she did not tell the police that she had noticed mood changes in R.R.

In December 2007, Reckart's three children, T.V., J.R, and R.L.R., moved into his house because their mother passed away. M.R. testified on cross-examination that Child Protective Services investigated the family residence in early 2008, and at that time, M.R. told the investigators that she lived with Reckart and that he was a good father.

In April 2008, Reckart and M.R. broke up. M.R. moved out of the house but was still "talking" to Reckart, which she explained included having romantic interludes. M.R. stated that R.R. knew that M.R. and Reckart were getting back together. On June 29, 2008, M.R. gave R.R. school clothes she had purchased, and R.R. reacted strangely. M.R. testified

3

that R.R. was "scared, she was crying, she was shaking, she was just very, very scared." M.R. tried to console R.R. and asked what was wrong. When asked by the State if R.R. told her what was wrong, M.R. said yes, but M.R. did not provide an explanation. The conversation occurred at 11:00 p.m., and M.R. had to work the next morning at 5:00 a.m. The next day, M.R. called the police.

On July 2, 2008, M.R. was interviewed by Morris Sublett with Child Protective Services. M.R. conceded on cross-examination that she did not tell Sublett that she had begun seeing Reckart again after they broke up in April 2008. Instead, she told Sublett that Reckart was harassing her. On redirect, M.R. explained that after R.R. "outcried" to her, she did not continue her relationship with Reckart.

During M.R.'s testimony on redirect, the State asked to approach the bench, stating that it intended to ask M.R. about injuries Reckart inflicted on her sons, R.R.R. and R.A.R. The State argued that the defense had painted Reckart as being a good father, and the State wanted to introduce injuries to M.R.'s other children as "extraneous offenses." Reckart's counsel requested a hearing outside the presence of the jury, and the trial court excused the jury. M.R. testified on voir dire about injuries both her sons suffered as a result of spankings by Reckart. After the examination by both the State and Reckart's counsel, Reckart did not lodge a specific objection to the testimony. Rather, the trial court stated that it would admit the testimony regarding R.R.R. but not R.A.R. "over counsel's objection."

The jury was brought back into the courtroom. On re-direct, M.R. testified that Reckart spanked R.R.R. with a paddle, causing him bruises. M.R. stated that R.R.R. had "black and blue on his butt like blood and streaks." M.R. stated that she asked Reckart not

4

to spank the children, and he agreed, but then he did it again. M.R. admitted on re-cross that she did not tell Child Protective Services about these incidents and that they occurred prior to her statement in early 2008 to Child Protective Services that Reckart was a good father.

Detective Thomas Laughlin with the City of Portland Police Department testified that he received a call from M.R. on June 29, 2008, reporting "what she was told by her daughter." Laughlin set up an interview at the Nueces County Children's Advocacy Center for R.R. On June 30, 2008, R.R. gave an interview in which she made an outcry of sexual abuse. After the interview, R.R. was examined by a Sexual Assault Nurse Examiner at Driscoll Children's Hospital. Laughlin obtained an arrest warrant for Reckart on July 1, 2008, for sexual assault of a child.

On cross-examination, Laughlin testified that he never went to Reckart's residence in Portland and did not execute a search warrant for physical evidence there. Laughlin further testified that when Reckart was arrested, Reckart voluntarily gave a DNA swab. Laughlin admitted that he did not know if individuals named William Franklin and Michael Whirl were living at the house in Portland at the time of the alleged sexual abuse, and he did not interview them. He conceded that the only research he conducted on the case were the interviews of M.R. and R.R., and he was unaware of any prior statements M.R. or R.R. had made to Child Protective Services regarding the living situation with Reckart.

On redirect, the State asked if M.R. gave Laughlin any physical evidence. He stated that M.R. gave him a "dildo" and a "cock ring." He explained that during R.R.'s interview with the children's advocacy center, R.R. told the investigator that Reckart used these devices on her.

5

Sandra Pardo testified that she is a Sexual Assault Nurse Examiner at Driscoll Children's Hospital, and she conducted an examination of R.R. She stated that in eighty percent of examinations, there is no physical trauma discovered. Pardo further explained that to find DNA evidence, an examination must be conducted within the first ninety-six hours after the assault. She explained that the female sexual organ heals itself quickly, and most likely, evidence of physical trauma will have dissipated around forty-eight hours after an assault.

Pardo reported what R.R. told her in her interview, as follows:

Patient states, "When I was in sixth grade it started. My mom's ex-boyfriend, Rick Reckart, he like [sic] sexually touched me on my breasts and my vagina and with his hands over and under my clothes. His dick and [sic] tried to put it in me, in my vagina a couple of times. About three times. Um, he would get a towel or something and come in it. He would put it in my mouth. He tried putting a dildo, he tried putting it in my vagina. He would lick me down there and stuff."

Pardo testified, however, that there were no physical signs of sexual abuse. Defense counsel did not object to Pardo's testimony on any grounds.

R.R. testified that, at the time of trial in March 2009, she was thirteen years old. She stated that Reckart began "hurting" her when she was eleven years old. She explained that Reckart would come to her room at night, put his hands in her pants, and touch her on and inside her "private part" with his hands and mouth. On two or three occasions, he touched her with his "private part." Specifically, she testified that he tried to put his "private part" in her "private part," but it "hurt too much." R.R. further testified that Reckart made her take showers with him, and in the shower, Reckart would put his fingers in her "private part." R.R. described a particular incident in the living room, where Reckart tried to have sex with her when they lived in Ingleside. She stated that Reckart made her shave her

6

private area and then attempted to have sex with her in the living room.

In August 2007, R.R.'s family and Reckart moved to Portland. R.R. explained that between September 2007 and April 2008, Reckart continued to abuse her. R.R. testified that in Portland during that time period, Reckart made R.R. perform oral sex on him on five occasions, digitally penetrated her "private part" on more than thirty occasions, and forced her to have intercourse with him. Furthermore, R.R. testified that Reckart would put his mouth on her "private part," and while in Portland, he did this more than twenty times. R.R. confirmed that Reckart also used "vibrators" or "dildos" on her by putting them in her "private part."

R.R. explained that she did not tell anyone about this at first because she was afraid her mother would not believe her and because Reckart made her promise. R.R. further testified, without objection from defense counsel, that she saw Reckart hit her brother with a belt, causing "bruises all over him and bleeding."

R.R. recalled Child Protective Services interviewing her when Reckart's children first came to live with her family. She confirmed that she did not tell Child Protective Services investigator Manuel Cano what Reckart was doing because she was "afraid [she] was going to get in trouble." R.R. stated that she finally told her mother because she found out that Reckart was trying to talk to M.R. again after their breakup and because she "thought they were going to get back together." She did not want them to get back together "because he would start touching [her] and stuff."

On cross-examination, R.R. conceded that when she gave her interview at the Child Advocacy Center, she did not discuss the living room incident. She clarified, however, that the living room incident occurred in Portland, not Ingleside. She conceded that other

people were in the house when some of the incidents took place, but she could not testify whether anyone else heard what was happening at the time. R.R. further testified that when Child Protective Services interviewed her in February 2008, before her outcry, she told the investigator that Reckart was a good father, that he never abuses any of his children, and that everyone in the house got along. R.R. testified that she was testifying against Reckart because she wanted him to go to jail and because she was scared of him.

## B. Defense's Case

Reckart then called witnesses in his defense. William Franklin testified that he stayed at Reckart's house in Portland for about six months during 2007 and 2008. He testified that he never observed anything unusual at the home and never heard any noises coming from R.R.'s room at night. He testified that he never witnessed any unusual bruises on M.R.'s children and that he never noticed Reckart and R.R. being missing for long periods of time. Franklin stated that he never observed R.R. acting scared of Reckart.

Michael Eugene Whirl testified that he lives with Reckart and had been staying with Reckart when M.R. and her children were living there. Like Franklin, Whirl stated that he never observed R.R. acting afraid of Reckart and that he never heard any noises in the middle of the night. Likewise, he never saw Reckart discipline or spank R.R.'s brothers.

Reckart's neighbor, Melvin Farrera, testified that he witnessed Reckart with his children and that Reckart was a loving father. Farrera stated that R.R. never appeared scared or afraid of Reckart. R.R. did not act abnormally and participated with the family.

Clifford Cole testified that he was a friend and neighbor of Reckart's. He never witnessed anything unusual going on with the children, and R.R. never appeared scared of Reckart. Again, Cole reiterated the testimony of Farrera, Whirl, and Franklin that he

8

never witnessed any bruises on either of R.R.'s brothers. Cole opined that Reckart was a good parent.

Manuel Cano testified that he previously worked as an investigator for Child Protective Services. In January 2008, Cano was assigned to investigate Reckart and his children because Reckart had recently obtained custody of them. Cano interviewed R.R. at school. Reckart's attorney asked what questions Cano had asked R.R., and Cano responded that he asked the "basic stuff" and if "she had ever been touched inappropriately by members of her family or by anybody else, for that matter." The State objected, and a hearing was held at the bench at which the State told the trial court that there was a ruling on a motion in limine "as far as the victim—she being victim of her cousin previously." Reckart's counsel stated that he just wanted to know about the situation with Reckart, and that he was not "trying to go there." The testimony continued, and Cano stated that R.R. told him that the home with Reckart was a happy environment and that she felt safe there. Cano stated that he discussed "good touches and bad touches," and R.R. indicated that nothing like that had happened with Reckart. R.R. told Cano that Reckart was a good father. Cano also testified that R.R.'s brothers seemed happy, and he did not notice anything out of the ordinary.

On cross-examination, Cano explained that he was investigating Reckart because he had received a report from school personnel that Reckart had been medically neglecting his two children. He also stated that it is not unusual for a child not to tell when they are still living with a perpetrator of sexual abuse.

Reckart then testified. He stated that he and M.R. broke up in April 2008, but then

9

they decided to get back together, and he proposed marriage. She accepted a ring from him, and two weeks later, R.R. alleged that Reckart had sexually abused her. M.R. called him and asked him to pick her up down the street, and M.R. came to his house. M.R. told him what R.R. said, but she had not called the police. According to Reckart, M.R. told him that "if she really believed it she would have called the cops already." Reckart told M.R. that he had not abused R.R. Four or five days later, Reckart was arrested.

Reckhart denied that he ever abused R.R. and denied that he had ever been alone with R.R. He claimed that he was a good father. Reckart testified that he believes in firm discipline. He admitted that he spanked his children, but he denied ever bruising them or making them bleed. He admitted that he had a light, ping-pong paddle that he used to spank the children.

Kimberly Wikoff testified that she had known Reckart for two years and had been to his house often. Wikoff lived down the street from Reckart. She visited when M.R. was there. Wikoff's daughter, D.W., was a friend to R.R. Wikoff testified that she never observed Reckart abusing the children and that he was a good father. R.R. never appeared intimidated by Reckart.

D.W. testified that R.R. would sometimes make statements about her relationship with Reckart. D.W. believed that R.R. did not like Reckart and did not like it that he was dating her mother. D.W. testified that R.R. told her that she "was going to do something for them to break up."

Kimberly Hudspeth testified that she was Reckart's former mother-in-law and that he was a good father. She never witnessed him abusing any child.

10

T.V. testified that she is Reckart's daughter and, at the time of trial, she was eleven years old. She testified that she stayed with R.R. at Reckart's house in Portland, and she shared a room with R.R. T.V. stated that she never saw Reckart do anything "mean" to R.R. T.V. never saw R.R. act scared of Reckart, and they were a happy family.

Reckart's other daughter, J.R., testified that she lived with Reckart in Portland when R.R. lived there. She claimed that she slept in the same room with R.R. J.R. stated that she did not witness her dad "do anything" to R.R.

## C. Rebuttal Witnesses

The State then called its rebuttal witnesses. R.R.'s brother, R.A.R., testified that he was in sixth grade. He stated that Reckart spanked him with a ping pong paddle "once or twice a day." R.A.R. testified that Reckhart also spanked his brother, R.R.R. R.A.R. explained that the spankings would leave bruises on his butt. R.A.R. testified that he had seen Reckart go upstairs to see his sister R.R. R.A.R. stated that Reckart would be alone with R.R. during those times. On cross-examination, R.A.R. admitted telling Cano, during the Child Protective Services Investigation, that "everything was fine at home" and that he liked living there. R.A.R. also told Cano that Reckart was a good father.

R.R.'s other brother, R.R.R., also testified, stating he was in the fourth grade at the time of trial. He stated that Reckart spanked him with a belt and with a paddle on his back and on his butt "a lot." R.R.R. said that the spankings left marks on his back and on his butt and made him bleed. R.R.R. further stated that Reckart kicked him in the chest. R.R.R. explained that Reckart told him to tell M.R. that he had fallen out of a tree. Reckart's attorney did not object during R.A.R.'s testimony or during R.R.R.'s testimony.

11

M.R. then testified again. The State asked her to recall the night that R.R. told her "about what was happening with her and your ex-boyfriend." The State then asked if M.R. recalled "approximately what time it was that [R.R.] told you about the abuse?" M.R. answered that it was 11:00 p.m. M.R. testified that she confronted Reckart and "told him that [she] couldn't believe that he had put his hands on my children that way . . . ." When Reckart told her that he loved her children, M.R. told him "maybe he loved them just a little bit too much." Reckart responded that he "never touched her." Defense counsel did not object to this testimony.

The jury found Reckart guilty of continuous sexual abuse of a young child. A punishment hearing was held, after which the jury sentenced Reckart to thirty years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. This appeal ensued.

## II. EXTRANEOUS OFFENSES

By his first issue, Reckart argues that the trial court erred by allowing evidence of extraneous bad acts allegedly committed by Reckart. Specifically, he argues that the State should not have been allowed to question M.R. in its case-in-chief about injuries Reckart allegedly caused to her sons. He argues that the testimony was admitted over his objection, and it violated Texas Rule of Evidence 404(b). *See* TEX. R. EVID. 404(b). We hold that Reckart waived any error in the admission of this evidence.

Initially, when the State wanted to question M.R. about Reckart spanking her sons, the attorneys approached the bench and asked for a hearing outside the jury's presence. After hearing M.R.'s proposed testimony, the trial court ruled that it would admit the

12

testimony regarding Reckart's spanking of R.R.R. but not of R.A.R. "over counsel's objection." Thus, Reckart's counsel obtained a favorable ruling as to testimony regarding Reckart spanking R.A.R. M.R. then was allowed to testify that Reckart spanked R.R.R., but her testimony did not address R.A.R.

On rebuttal, the State called R.A.R., who testified without objection that Reckart spanked him with a ping pong paddle "once or twice a day." R.A.R. testified that Reckhart also spanked his brother, R.R.R. R.A.R. explained that the spankings would leave bruises on his butt.

In order to preserve a challenge to the trial court's admission of evidence, the complaining party must have lodged a timely objection and have obtained an adverse ruling. TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103. "[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State,* 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see also Moore v. State,* 999 S.W.2d 385, 402 (Tex. Crim. App. 1999) ("The admission of the same evidence from another source, without objection, waives previously stated objections.").

Although Reckart preserved his objection to testimony M.R.'s regarding Reckart's spanking of R.R.R. by obtaining a ruling outside the presence of the jury, *see* TEX. R. EVID. 103, the record reflects that he never obtained an adverse ruling as to her testimony regarding R.A.R., and Reckart did not object when R.A.R. testified that Reckart spanked him. *See* TEX. R. APP. P. 33.1(a). The testimony from R.A.R. was essentially the same; therefore, Reckart waived his arguments regarding this testimony by allowing R.A.R.'s

13

testimony without objecting and pursuing the objection to an adverse ruling. *Id.*; *Leday,* 983 S.W.2d at 718. We overrule Reckart's first issue.

### III. UNCORROBORATED OUTCRY TESTIMONY

Reckart's second issue states: "The admission of uncorroborated outcry testimony during trial violated Reckart's right of Due Process." However, in his argument, Reckart does not address how or why his right of due process was violated. Rather, Reckart argues that R.R.'s outcry statement to her mother was inadmissible under article 38.072 of the Texas Code of Criminal Procedure because R.R. was over the age of twelve when she made her outcry and because her statements were not specific enough. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (Vernon Supp. 2009). Furthermore, he asserts that he was "not afforded the opportunity to really test the veracity of [R.R.]'s allegations since [R.R.]'s past sexual behavior was not allowed as evidence."[1]

Reckhart has waived any "due process" challenge to outcry testimony because he has failed to brief that argument to this Court. TEX. R. APP. P. 38.1(i). Moreover, Reckart waived any challenge to M.R.'s testimony regarding R.R.'s outcry by failing to object at trial. TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103; *Rosas v. State,* 76 S.W.3d 771, 776-77 (Tex. App.–Houston [1 Dist.] 2002, no pet.) (citing *Holland v. State*, 802 S.W.2d 696, 699-700 (Tex. Crim. App. 1991); *Beckham v. State*, 29 S.W.3d 148, 153 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd) (holding complaints that article 38.072 violates confrontation rights

---

[1] During cross-examination of M.R., Reckart's attorney approached the bench to discuss a matter subject to the State's motion in limine. Reckart's attorney indicated that at some point, there was a note from school about R.R. engaging in sexual activity with boys, and Reckart's counsel wanted to address it with M.R. The trial court asked, "What's that got to do with this?" Reckart's attorney replied, "Okay. I'll reserve it for later." Reckart's attorney, however, did not bring it up again.

under federal constitution require objection to preserve error)). Accordingly, we overrule his second issue.

## IV. SUFFICIENCY OF THE EVIDENCE

By his third issue, Reckart argues that the evidence is legally and factually insufficient to support the verdict. Specifically, he argues that although the alleged victim, R.R., testified to the acts alleged to be sexual abuse, the evidence is legally insufficient because R.R.'s testimony was uncorroborated, unsubstantiated, and not credible. Reckart argues that the evidence is factually insufficient because several witnesses testified that Reckart was a good father and did not abuse R.R. and because R.R.'s testimony was uncorroborated, unsubstantiated, and not credible. We disagree.

### A.     Standard of Review and Applicable Law

When reviewing the legal sufficiency of the evidence, we must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '[we believe] that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "[W]e assess all of the evidence 'in the light most favorable to the prosecution.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Id.* at 518 (citing *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992)).

"Evidence that is legally sufficient, however, can be deemed factually insufficient in two ways: (1) the evidence supporting the conviction is 'too weak' to support the

15

factfinder's verdict, or (2) considering conflicting evidence, the factfinder's verdict is 'against the great weight and preponderance of the evidence.'" *Id.* (quoting *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)). In conducting a factual sufficiency review, we consider all of the evidence in a neutral light and will "find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id.* (quoting *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). "An appellate court gives due deference to the findings of the fact-finder, but the appellate court may substitute its judgment for the jury's credibility and weight determinations to a very limited degree." *Render v. State*, No. 05-09-00528-CR, 2010 WL 2880219, at *9 (Tex. App.–Dallas July 23, 2010, pet. filed) (citing *Watson*, 204 S.W.3d at 416-17; *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000)). "However, the existence of contrary evidence is not enough to support a finding of factual insufficiency." *Id.* A conflict in the evidence will not justify a new trial simply because the appellate court disagrees with the jury's resolution of that conflict. *Id.* (citing *Watson*, 204 S.W.3d at 417). "An appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in a better position to judge." *Id.* (citing *Lancon v. State*, 253 S.W.3d 699, 706 (Tex. Crim. App. 2008)).

We measure the legal and factual sufficiency of the evidence based on a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). A hypothetically correct jury charge "accurately promulgates the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof

16

or restrict the state's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Texas Penal Code section 21.02 provides that a person commits the offense of continuous sexual abuse against a child if: "(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age." TEX. PENAL CODE ANN. § 21.02(b).

## B.    Legal Sufficiency

Reckart argues that the evidence supporting the conviction was legally insufficient because the State's case was based on one witness, R.R., who gave uncorroborated, unsubstantiated, and non-credible testimony about the alleged abuse.  First, Reckart argues that R.R. told Child Protective Services investigator Cano a "completely different story" and that at trial, R.R. embellished her story by adding facts that did not appear in any of her prior interviews.  Second, Reckart argues that R.R.'s story was "doubtful" because there were other people who lived with R.R. who did not hear or see any of the abuse. Finally, Reckart points out that (1) the State did not present any DNA test results, (2) local police did not adequately investigate the case by overlooking possible witnesses, (3) there were no physical signs of abuse, and (4) R.R. did not exhibit "stress."

Texas law provides that the testimony of a child sexual abuse victim alone is sufficient to support a conviction based on that abuse.  TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005); *Ozuna v. State,* 199 S.W.3d 601, 606 (Tex. App.–Corpus Christi

17

2006, no pet.). "Courts give wide latitude to testimony given by child victims of sexual abuse." *Ozuna*, 199 S.W.3d at 606. "The victim's description of what happened to him need not be precise, and he is not expected to express himself at the same level of sophistication as an adult." *Id.*; *see also Cano v. State,* No. 13-09-00042-CR, 2010 WL 2205169, at *9 (Tex. App.–Corpus Christi June 3, 2010, pet. filed) (mem. op., not designated for publication). In fact, even if the victim has recanted the allegations, the jury is entitled to credit the earlier allegations and disbelieve the recanted testimony. *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.–Corpus Christi 2008, pet. ref'd). Thus, R.R.'s testimony is legally sufficient to sustain the conviction, despite Reckart's contentions. We overrule his legal sufficiency challenge.

## C. Factual Sufficiency

Similarly, Reckart argues that several witnesses testified that he was a good father and that he did not abuse R.R. He asserts that in a 2008 investigation, Child Protective Services did not find any evidence of abuse. Moreover, he argues that M.R. was demonstrably not a credible witness because when M.R. first learned about R.R.'s allegations, she confronted Reckhart instead of going to the police immediately. M.R. also told Child Protective Services that "Reckart was a good father" during the 2008 investigation, but at trial, she suggested that she always suspected something.

Furthermore, Reckart argues that R.R. was not a credible witness. Specifically, R.R. did not provide exact dates for each alleged incident but only provided a general time frame. During the 2008 investigation, R.R. did not tell the Child Protective Services investigator about any abuse. R.R. admitted on cross-examination to changing her story

18

a few times and that she wanted Reckart to go to jail.

At most, Reckart merely points to conflicts in the evidence and to credibility issues that are most appropriately resolved by the jury. *See Render*, 2010 WL 2880219, at *9. As we noted earlier, there is no requirement that the victim's testimony be corroborated, and the alleged inconsistencies in R.R. and M.R.'s testimony were within the province of the jury to resolve. *See id.; see also Cano*, 2010 WL 2205169, at *10. We will defer to the jury's determination regarding the weight of the testimony. *See Render*, 2010 WL 2880219, at *9. We overrule Reckart's third issue.

## V. Right to an Impartial Jury

By his fourth and fifth issues, Reckart argues that section 21.02 of the Texas Penal Code violates his right to trial by an impartial jury under the Sixth Amendment to the United States Constitution and article I, section 10 of the Texas Constitution. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. Penal Code Ann. § 21.02. He argues that under section 21.02(d), a jury is not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. Tex. Penal Code Ann. § 21.02(d). Subsection (d) provides:

> If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

*Id.*

In his fourth issue, Reckart argues that:

> It is the duty of the jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of juror [sic] must decide the case

19

for his or herself, but only after an impartial consideration of ALL the evidence with fellow jurors. If each juror can randomly pick any two or more acts without agreement, it undermines the weight or effect of our rules for the mere purpose of returning a verdict.

Reckart cites *Durrough v. State*, in which the Texas Court of Criminal Appeals held that an impartial jury is one that does not favor a party or an individual because of the emotions of the human mind, heart, or affections. 562 S.W.2d 488, 489-90 (Tex. Crim. App. 1978). In his fifth issue, Reckart argues that section 21.02 is "facially" unconstitutional and "vague" because it "encourages arbitrary and discriminatory enforcement by interfering with the fundamental right to a fair and impartial jury."

Reckart, however, does not cite any cases that support his claim that the right to an impartial jury under the Federal or State Constitution includes the right to a unanimous jury, and we have found none. *See Apodaca v. Oregon*, 406 U.S. 404, 411-12 (1972) (plurality agreeing that in state criminal prosecution, less than unanimous verdict did not violate Sixth Amendment right to impartial jury); *see also State v. Espinoza*, No. 05-09-01260-CR, 2010 WL 2598982, at *3 (Tex. App.–Dallas June 30, 2010, pet. filed) (not designated for publication). We overrule Reckart's fourth and fifth issues.

## VI. EIGHTH AMENDMENT

By his sixth issue, Reckart argues that the jury instructions in this case were internally contradictory and created inherent confusion, rendering the statute unconstitutional and in violation of the Eighth Amendment. *See* U.S. Const. amend. VIII. Reckart relies on *Penry v. Lynaugh*, 492 U.S. 302, 322-28 (1989) (*Penry I*), and *Penry v. Johnson*, 532 U.S. 782, 782-85 (2001), arguing that if the jury receives "mixed signals," then the conviction violates the Eighth Amendment. The problem with Reckart's brief,

20

however, is that he does not identify which jury instructions he claims were conflicting and gave the jury "mixed signals." Under the circumstances, this argument is inadequately briefed. TEX. R. APP. P. 38.1(i). We overrule Reckart's sixth issue.

## VII. PROOF BEYOND A REASONABLE DOUBT

By his seventh issue, Reckart argues that section 21.02(d), quoted above, allows the State to obtain a conviction on less than proof beyond a reasonable doubt, which he argues violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Texas Code of Criminal Procedure article 38.03, and Texas Penal Code section 2.01. *See* U.S. CONST. amend. XIV; TEX. CODE CRIM. PROC. ANN. art. 38.03; TEX. PENAL CODE ANN. § 2.01. Reckart's argument is that:

> Section 21.02 of the penal Code inherently changes the burden of proof required by criminal procedure. By allowing the jury to bypass evaluating each element of the offense beyond a reasonable doubt, the presumption of innocence is eliminated or severely reduced. Not to reach a unanimous decision on each element of the offense, especially on one or more charges, fundamentally violates the constitution. Therefore, this Court should reverse Reckart's conviction and sentence, and vacate his judgment.

We disagree with the main premise underlying Reckart's argument—that the statute allows a non-unanimous verdict on each element of the offense.[2] *See Render,* 2010 WL 2880219, at *8; *see also Espinoza*, 2010 WL 2598982, at *3 (Tex. App.–Dallas June 30, 2010, pet. filed) (mem. op., not designated for publication); *Jacobsen v. State,* No. 03-09-00479-CR, 2010 WL 2330340, at *5 (Tex. App.–Austin June 8, 2010, no pet.) (mem. op., not designated for publication).

---

[2] We note that Reckart does not argue that section 21.02 violates article I, section 13 of the Texas Constitution, which provides that the jury in a criminal case must render a unanimous verdict. Our holding, however, undermines the basic premise that would support such an argument.

21

In *Ngo v. State*, the State relied on evidence that at different times the defendant committed three different acts that the applicable statute defined as separate criminal offenses and not as means of committing a single criminal offense, and it used that evidence to obtain a single conviction. 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). The court of criminal appeals held that "the failure to instruct the jury that it must be unanimous on which specific criminal act the defendant committed violated the defendant's state constitutional and statutory right to a unanimous jury verdict." *Id.* at 752. The court further held, however, that the jury need not agree on all the "underlying brute facts [that] make up a particular element." *Id.* at 747 (citing *Richardson v. United States*, 526 U.S. 813, 815 (1999)).

In *Render v. State*, the Dallas Court of Appeals held that section 21.02 did not allow for a non-unanimous verdict on the essential elements of the offense and distinguished *Ngo*, because "[t]he applicable statute in *Ngo* defined the three acts involved as separate criminal offenses while the applicable statute here defines the two or more acts involved as means of committing a *single* criminal offense." 2010 WL 2880219, at *8 (emphasis added) (citing *Jefferson v. State*, 189 S.W.3d 305, 312-13 (Tex. Crim. App. 2006) (holding that an injury could be caused in any of multiple ways and the jury does not have to unanimously agree as to any particular act or omission); *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008) ("The Legislature has considerable discretion in defining crimes and the manner in which those crimes can be committed")). Section 21.02 allows the State to seek a single conviction for a "series" of acts of sexual abuse with evidence that, during the relevant time period, the accused committed two or more different acts that

22

section 21.02 defines as means of committing a single criminal offense and not as two or more separate criminal offenses. *Id.* Thus, each act of sexual abuse is not an "element" of the offense; rather, the "series" is the element of the offense, and the acts of sexual abuse are merely the manner and means of committing an element of the offense. *Id.*; *Jacobsen,* 2010 WL 2330340, at *3 ("Under the plain language of section 21.02, it is the commission of two or more acts of sexual abuse over the specified time period—that is, the pattern of behavior or the series of acts—that is the actus reus element of the offense as to which the jurors must be unanimous in order to convict."). Thus, we conclude that the statute does not allow for a non-unanimous verdict on an essential element of the offense. We overrule Reckart's seventh issue.

## VIII. CONCLUSION

Having overruled all Reckart's issues, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Publish.
TEX. R. APP. P. 47.2(b).


Delivered and filed the
26th day of August, 2010.

23