NUMBER 13-10-00270-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS CHRISTI -
EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



ANDRES ENRIQUE CANTU,                                                       Appellant,

 

v.

 

THE STATE OF TEXAS,                                                                
Appellee.

 

 



On appeal from the 139th District
Court

of Hidalgo County, Texas.

 

 



 MEMORANDUM OPINION

 

Before Chief Justice Valdez and
Justices Rodriguez and Garza

Memorandum Opinion by
Chief Justice Valdez

            A jury convicted appellant, Andres
Enrique Cantu, of two counts of continuous sexual abuse of a child.  See
Tex. Penal Code Ann. § 21.02
(West Supp. 2010).[1] 
The trial court sentenced Cantu to two concurrent terms of fifty years’
confinement.  By four issues, appellant contends that the evidence was legally
and factually insufficient, the trial court submitted an erroneous jury charge,
and his trial counsel rendered ineffective assistance.  We affirm.

I.          Background

            C.F.C., Cantu’s wife, testified that
she has two daughters, Jessica and Joanna Rodriguez.[2]  C.F.C. stated
that in September 2007, she lived with Cantu, Jessica, Joanna, and her other
two children in Pharr, Texas.  According to C.F.C., Jessica and Joanna shared a
small bedroom containing a bunk bed, where the girls slept, and another bed
where C.F.C. sometimes slept.[3]

            C.F.C. testified that in August or
September 2008, Jessica told her something about Cantu that caused her to
become concerned.  C.F.C. did not state what Jessica told her.  When C.F.C.
confronted Cantu with Jessica present, he told her that Jessica was not telling
the truth, and Jessica recanted her story.   C.F.C. stated that she then left
the home with her children.  C.F.C. claimed that when she returned home, Cantu
left after she asked him to leave.  Cantu eventually came back to live in the
home.

According to C.F.C.,
Joanna was in Mexico visiting family when Jessica made the accusation against
Cantu.  C.F.C. stated that in August or September, after Jessica “told [her]
what was going on,” C.F.C.’s brother, “Chava,” brought Joanna back to the
family home and stayed with the family until December.  C.F.C. claimed that
Cantu returned to the home when Joanna returned from Mexico.  C.F.C. testified
that in December 2008, she was informed that Jessica had written a letter to
Santa.

Jessica, who was ten at
the time of Cantu’s trial, testified that in 2008, she lived in Pharr with
C.F.C., Cantu, Joanna, and her two brothers.  Jessica stated that she sometimes
slept in the top bunk bed and sometimes she slept on the bottom bunk bed. 
According to Jessica, Chava stayed with the family for approximately three
months.

The State asked Jessica
to identify a letter written in Spanish to Santa.  Jessica stated that,
although the letter was a photo copy and her signature was missing, it was the
letter she had written in December 2008.[4] 
The trial court admitted the letter into evidence as State’s exhibit 1. 
Cantu’s counsel stated that he had no objections to admission of the letter. 
Jessica then read the letter in Spanish into the record, and the interpreter
orally translated the letter to English as follows:

Dear
Santa, I want you to bring me happiness bring me peace and tell my stepfather
not to touch me anymore.  And make me change because you have not found out
that I make life impossible and for me to help my mother with the chores and to
help with my brother to change the diapers.  I wish I had with me by my side my
true father.  That is what I ask of you.  I believe it is five.  Thank you.

 

            Cantu’s trial counsel then stated that
he wanted to “file an objection.”  Following a bench conference that was not
transcribed by the court reporter, the trial court stated that the letter would
be admitted into evidence.  Cantu’s counsel then stated that in addition to his
off-the-record objection, he was objecting to the letter on the basis that it
was “not properly interpreted.”  The trial court then stated:

There
will be a translation given to you as a jury aid.  It’s not going to be in
evidence[;] it’s to help you as a jury aid.  You will read that letter and
you’ll make the decision as to what the letter says.  Okay.  And the
interpretation, [Cantu’s trial counsel] will be allowed to cross-examine what
he thinks is right and what’s wrong about that letter.

 

Cantu’s trial counsel stated that the interpreter
had not “shown his experience and his education.”  The trial court replied,
“He’s a certified interpreter for this court” and pointed out that the
interpreter had not been “challenged.”  Defense counsel replied, “That’s fine,
Your Honor.”

            Jessica then testified that in the
letter she wrote, “dile a mi padrasto que no me este tocando.”  The
interpreter translated the meaning as, “Tell my stepfather not to touch me
anymore.”  When the State asked, “Jessica[,] who were you asking to stop touching
you?”, she responded, “To my stepfather. . . .  Cantu.” 
Jessica stated that she had informed her mother prior to writing the letter to
Santa that Cantu had been touching her.  Then Jessica explained that she did
not remember what happened after she told her mother about Cantu touching her. 
Jessica also believed that her mother was afraid after she told her Cantu was
touching her.

            When the State asked, “And from the
time you were eight years old, to the date you wrote this letter to Santa in
class, did [Cantu] ever touch you on your private parts,” Jessica replied,
“Yes.”  Jessica then claimed that Cantu touched her in her “private parts” with
his hand more than two times.  However, Jessica did not know if Cantu touched
her more than five times.  Jessica testified that she told her mother that
Cantu was touching her before her uncle Chava came to stay with the family.  Jessica
pointed to the genital area of a doll when asked to show the jury where Cantu
touched her.  Jessica stated that sometimes Cantu would touch her underneath
her clothes and sometimes he would touch her over her clothes.  Jessica
testified that she felt “bad” and was afraid when Cantu would touch her. 
According to Jessica, the touching usually occurred at night while she was in bed;
however, she also recalled an incident where Cantu touched her legs and “middle
part” while they were in a small swimming pool.  Jessica stated that Cantu also
touched her breast one time “in the room of [her] mom when [she] was passing
[walking by].”

            Debbie Lopez, a counselor at Jessica’s
former elementary school, testified that after reading Jessica’s letter to
Santa, she asked Jessica to explain what was happening.  Lopez stated that
Jessica told her that Cantu had been touching her and her sister, Joanna. 
According to Lopez, Jessica said that Cantu “would get on top of her at night
under the covers.”  When Lopez asked where Cantu touched Jessica, Jessica
replied, “where I go to the bathroom.”  Lopez stated that Jessica also stated
that Cantu touched her breast and kissed her.  Lopez claimed that although she
did not ask Jessica how many times Cantu touched her, she inferred that the
inappropriate touching occurred more than once because Jessica told her about
several “scenarios” concerning when the touching happened.  Lopez testified as
follows:

Well, I asked her when it had happened, and she kind of
told me scenarios.  Like, one time she said that she was in bed and her sister
was there in the bed, and that he had gone over to the room, right.  And I
asked her, well if your sister was there, how come she didn’t hear this?  Was
she out?  She says, no he’s very quiet, was one time.

 

And then she said something else of [sic] in the mom’s
room.  That in the mom’s room, they were in there, I believe, and he’s walking
in the hallway that he had, I think put his hands around her waist, or
something like that, and touched her breasts passing by in the hallway also. 
So it was like two or three different times that she was telling me.

 

Lopez then spoke with
Joanna.  According to Lopez, once she told Joanna that she knew what was
happening, Joanna told her that Cantu touched her and her sister, Jessica, and
attempted to touch Joanna in the shower or while she was bathing.  However,
Lopez then stated that she could not remember if Joanna told her that Cantu actually
touched her.  Lopez testified that Jessica told her that one night she woke up
and saw Cantu on top of Jessica and that Cantu “had his hand in her pants.”  On
cross-examination, defense counsel asked, “[Lopez], how many times did Joanna
tell you that [Cantu] actually touched her,” Lopez replied, “She told me one
specific time.”[5] 
Lopez stated that Joanna then told her that on several other occasions, Cantu
attempted to touch her.

            Joanna, an eleven-year-old child at
the time of trial, testified that in December 2008, she lived in Pharr with her
family and lived there for approximately eight years.  Joanna stated that she
slept on a bunk bed with her sister, Jessica.  The following exchange then
occurred:

[The State:]:   And during the time from when you were nine
years old in September of 2007, up until the—up until December 2008, when your
sister wrote that letter in school did anybody ever touch you in a way that
they shouldn’t have?

 

Joanna:         Cantu.

 

[The State]:    And how many times would you say that that
happened September [the inappropriate touching] between September of 2007 and
when you were nine years old?

 

Joanna:         A
lot of times.

 

[The
State]:    Up to December of 2008?  A lot of times?

 

Joanna:         Uh-huh.

 

Joanna then stated that Cantu touched her more
than ten times.  Joanna testified that Cantu mostly touched her during the
night with his hands “[i]n [her] private parts” underneath her clothes.  When
asked to point to the private parts of a doll, Joanna pointed to the genital
area.  Joanna stated that Cantu put his finger in her private parts and she
asked him to stop because it felt awkward.  According to Joanna, sometimes
Cantu stopped touching her when she asked him to stop and sometimes he would
not stop.

            Joanna also saw Cantu touching Jessica
on her private parts “various times.”  The State asked, “More than two times,”
and Joanna said, “Yes.”  Joanna stated that she believed that Cantu touched her
during the time that Chava stayed with the family and that he stayed with them
for about three or four months.

            Cantu testified on his own behalf that
C.F.C. and Jessica are in the United States illegally.  Cantu stated, that five
years after he married C.F.C., he attempted to help her “fix her papers” but
that, because C.F.C. had allegedly been deported three times, she was not
eligible to become a citizen.  During his testimony, Cantu stated that he
believed that Joanna made up the accusations against him in order to “help her
mother [C.F.C.] become a legal resident alien.”[6]

            Cantu denied going into the girls’
room at night and touching Joanna’s private parts on several occasions.  When
asked if Joanna was lying about the touching, Cantu responded, “I don’t believe
that’s possible, sir.  I—I’ve never—I would never ever think of doing something
like that to them.”  Cantu denied touching Jessica inappropriately.  On
cross-examination, Cantu denied that C.F.C. had confronted him about touching
Jessica before she wrote the letter to Santa and that he was “kicked out of
[his] house for a couple of weeks.”

            Cantu also called Lopez to testify. 
Lopez reiterated that Joanna told her that Cantu only touched her one time and
that she did not specify where he touched her.

II.         Sufficiency of the Evidence

            By his first and second issues, Cantu
contends that the evidence is legally and factually insufficient to support the
verdict.  Specifically, Cantu argues that the evidence did not show that the
sexual abuse occurred during a time span that was thirty days or more in
duration.[7]

A.        Standard of Review and Applicable Law

            The court of criminal appeals has held
that there is “no meaningful distinction between the Jackson v. Virginia
legal sufficiency standard and the Clewis factual-sufficiency standard”
and that the Jackson standard “is the only standard that a reviewing
court should apply in determining whether the evidence is sufficient to support
each element of a criminal offense that the State is required to prove beyond a
reasonable doubt.”  Brooks v. State, 323 S.W.3d 893, 902-03, 912 (Tex.
Crim. App. 2010) (plurality op.).  Accordingly, we review Cantu’s claims of
evidentiary sufficiency under “a rigorous and proper application” of the Jackson
standard of review.  Id. at 906-07, 912.  Moreover, we do not refer
separately to legal or factual sufficiency and will only analyze Cantu’s issues
under the Jackson standard.  See id. at 985 (concluding that
there is no meaningful distinction between a legal and factual sufficiency
analysis).

Under the Jackson
standard, “the relevant question is whether, after viewing the evidence in the
light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt.”  Jackson
v. Virginia, 443 U.S. 307, 319 (1979); see Brooks, 323 S.W.3d at
898-99 (explaining that in the Jackson standard we consider “all of the
evidence in the light most favorable to the verdict,” and determine whether the
jury was rationally justified in finding guilt beyond a reasonable doubt).  “[T]he
fact[-]finder's role as weigher of the evidence is preserved through a legal
conclusion that upon judicial review all of the evidence is to be
considered in the light most favorable to the prosecution.”  Jackson, 443
U.S. at 319 (emphasis in original); see Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979) (“The jury,
in all cases is the exclusive judge of facts proved and the weight to be given
to the testimony . . . .”); Wesbrook v. State, 29 S.W.3d 103, 111 (Tex.
Crim. App. 2000) (“The jury is the exclusive judge of the credibility of
witnesses and of the weight to be given testimony, and it is also the exclusive
province of the jury to reconcile conflicts in the evidence.”).

We measure the legal
sufficiency of the evidence by the elements of the offense as defined by a
hypothetically correct jury charge.  Coleman v. State, 131 S.W.3d 303,
314 (Tex. App.—Corpus Christi 2004, pet. ref’d) (citing Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  The elements of the offense of
continuous sexual abuse of a child are:

“(1)
during a period that is 30 or more days in duration, the person commits two or
more acts of sexual abuse, regardless of whether the acts of sexual abuse are
committed against one or more victims; and (2) at the time of the commission of
each of the acts of sexual abuse, the actor is 17 years of age or older and the
victim is a child younger than 14 years of age.”  Thus, to convict the
appellant of this offense, the jury must have found that appellant committed at
least two acts of sexual abuse over a period of at least thirty days.

 

Render v. State, 316 S.W.3d 846, 857 (Tex.
App.—Dallas 2010, pet. ref’d) (quoting Tex.
Penal Code Ann. § 21.02(b)).

B.        Thirty Days or More in Duration

By his first issue, Cantu
complains that the evidence was insufficient to establish that the sexual abuse
of Jessica and Joanna took place over a span of thirty or more days.  Cantu
states he will “assume that the [S]tate proved all of the elements of the
offense with the exception of the very first and most pivotal element:  the
time frame.”  Specifically, Cantu argues that Jessica’s “references [to a time
frame] were general in nature and she never specified that [Cantu] had touched
her inappropriately during the time line the [S]tate had alleged in its
indictment [from September 1, 2007 to December 10, 2008].”  Cantu further
argues that Joanna “also testified about the time line in broad generalities,
and she never testified that [Cantu] had touched her inappropriately during the
time period specified in the indictment.”

C.F.C. testified that in
August or September 2008, Jessica told her something about Cantu that caused
her to become concerned and to confront Cantu.  According to C.F.C., Joanna was
in Mexico visiting family at this time.  Jessica testified that she told her
mother that Cantu had touched her private parts before Chava visited the
family.  C.F.C. stated that Chava visited the family after Jessica “told [her]
what was going on.”  Jessica testified that Cantu touched her breasts before
Chava came to visit the family.

Jessica then wrote a
letter to Santa in December 2008.  Jessica testified that when she wrote the
letter, she was asking for Santa to “tell” Cantu not to touch her anymore. 
Jessica stated that Cantu touched her more than two times “from the time” she
was eight years old “to the date” she wrote the letter to Santa.  Joanna
testified that she saw Cantu touch Jessica’s private parts “various times.”  On
cross-examination, Jessica claimed that while Chava slept in her bedroom, she
remembered a “body, or a person” come into her room.

When asked if someone
touched her inappropriately during the time from September 2007 until December
2008, Joanna replied that Cantu did so “[a] lot of times.”  Joanna testified
that Cantu touched her private parts more than ten times.

Although the child
victims in this case were unable to articulate the exact times and dates that
Cantu touched their private parts, there was sufficient evidence to allow the
jury to determine whether the crimes occurred during a period that was thirty
days or more.  See Williams v. State, 305 S.W.3d 886, 890 n.7 (Tex.
App.—Fort Worth 2010, no pet.) (“Arguably this [the child’s inability to
articulate the exact dates when the abuse occurred] is precisely the kind of
situation the Legislature considered when enacting Section 21.02 of the Texas
Penal Code.”) (citing Dixon v. State, 201 S.W.3d 731, 737 (Tex. Crim.
App. 2006) (Cochran, J., concurring)).  The testimony established that Jessica
was sexually abused by Cantu prior to Chava’s visit and continued though
Chava’s stay with the family, a period of at least three months.  The testimony
further established that Cantu sexually abused Joanna from September 2007 until
December 2008.  Viewing the evidence in the light most favorable to the
prosecution, we conclude that a rational trier of fact could have found beyond
a reasonable doubt that Cantu touched Jessica and Joanna on their private parts
during a period that is thirty or more days in duration.  See Jackson,
443 U.S. at 319; see also Brooks, 323 S.W.3d at 898-99.  Therefore, the
evidence was legally sufficient to support both counts of continuous sexual
abuse of a child.  We overrule Cantu’s first issue. [8]

III.        Jury Charge Error

            By his third issue, Cantu contends
that the trial court “reversibly erred in submitting the charge to the jury
without including separate unanimity instructions in the application paragraphs
as to counts one and two.”[9] 
Specifically, Cantu asserts that “the jury charge contained only a general
instruction informing the jury that its verdict had to be reached by a
unanimous vote; however, glaringly absent from the charge was a separate unanimity
instruction in the application paragraph itself.”  Cantu then claims that the
“jury unanimity instruction should have been included and incorporated into the
application paragraph of the jury charge as to both counts one and two.”

            Cantu cites no authority, and we find
none, requiring a separate unanimity instruction in the application paragraph
when the charged offense is continuous sexual abuse of a child.  The only
authority Cantu cites is Williams v. State; however, Cantu does not
provide a clear argument explaining how Williams supports his
assertions.  See generally 305 S.W.3d at 886-93.  Cantu’s claims are not
clearly set out.[10] 
See Tex. R. App. P.
38.1(i).  Therefore, Cantu’s third issue is inadequately briefed.  See id.

Nonetheless, we note that
the court in Williams recognized that penal code section 21.02 states:

If
a jury is the trier of fact, members of the jury are not required to agree
unanimously on which specific acts of sexual abuse were committed by the
defendant or the exact date when those acts were committed.  The jury must
agree unanimously that the defendant, during a period that is 30 or more days
in duration, committed two or more acts of sexual abuse.

 

Id. at 892.  The court then concluded that
the jury must only reach a unanimous verdict concerning whether the defendant
committed two or more acts of sexual abuse during a period that is thirty days
or more and that the jury did not have to unanimously agree on which specific
acts of sexual abuse were committed.  Id.  The Williams Court did
not conclude that the unanimity instruction must be included in the application
paragraph.  It merely concluded that the instruction, which happened to be in
the application paragraph, was not erroneous.  Id.  Therefore, Williams
does not support Cantu’s claims that the trial court’s jury charge was
erroneous.

Moreover, section 21.02 creates
a single element, a “series” of sexual abuse acts, and does not make each act a
separate offense.  See Tex. Penal
Code Ann. § 21.02; Reckart v. State, 323 S.W.3d 588, 601 (Tex.
App.—Corpus Christi 2010, pet. ref’d) (“Section 21.02 allows the State to seek
a single conviction for a ‘series’ of acts of sexual abuse with evidence that,
during the relevant time period, the accused committed two or more different
acts that section 21.02 defines as means of committing a single criminal
offense and not as two or more separate criminal offenses.  Thus, each act of
sexual abuse is not an ‘element’ of the offense; rather, the ‘series’ is the
element of the offense, and the acts of sexual abuse are merely the manner and
means of committing an element of the offense.”) (internal citations omitted); see
also Lewis v. State, No. 02-10-00004-CR, 2011 Tex. App. LEXIS 5455, at *16
(Tex. App.—Fort Worth July 14, 2011, no pet. h.) (mem. op., not designated for
publication) (explaining that unlike the case of the State charging two
separate offenses in the disjunctive, section 21.02 “does not make each act a
separate element but creates a single element, a ‘series’ of sexual abuse.  Jurors
must agree unanimously only that the defendant, during a period of thirty or
more days, committed two or more acts of sexual abuse”) (internal citations
omitted).  The statute requires only that jurors unanimously agree that the
defendant, during a period of thirty or more days, committed two or more acts
of sexual abuse.  Reckart, 323 S.W.3d at 601; see Tex. Penal Code Ann. § 21.02; see
also Lewis, 2011 Tex. App. LEXIS 5455, at *16.

Here, the jury charge for
both counts stated:

You
are instructed that as members of the jury you are not required to agree
unanimously on which specific acts of sexual abuse, if any, were committed by
the Defendant or the exact date when those acts were committed, if any.  The jury
must agree unanimously that the Defendant, during a period that was 30 or more
days in duration, committed two or more acts of sexual abuse as that term has
been previously defined.

 

This instruction, although not included in the
application paragraph, sets out the law as stated in section 21.02.  See
Tex. Penal Code Ann. § 21.02.  Therefore,
the jury was properly instructed that in order to find Cantu guilty of the
charged offense, it was required to unanimously agree that during a period that
was thirty or more days in duration, Cantu committed two or more acts of sexual
abuse.  “Unanimity in this context means that each and every juror agrees that
the defendant committed the same, single, specific criminal act.”  Ngo v.
State, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); see Pizzo v. State,
235 S.W.3d 711, 714 (Tex. Crim. App. 2007) (holding unanimity ensures all
jurors reach consensus on same act for conviction).  Here, the jury charge
instructed the jury that it must agree that Cantu committed the same, single,
specific criminal act, i.e., a “series” of acts of sexual abuse.  See
Reckart, 323 S.W.3d at 601.  Therefore, we find no error in the jury
charge.[11] 
Accordingly, we overrule Cantu’s third issue.

IV.       Ineffective Assistance of Counsel

            By his fourth issue, Cantu contends
that his trial counsel rendered ineffective assistance by failing “to object to
the ‘Santa Letter,’ written entirely in the Spanish language” and by failing to
object to “the State’s introduction of the photocopy of the ‘Santa Letter.’”

A.        Standard of Review and Applicable Law

            Ineffective assistance of counsel
claims are evaluated under the two-part test articulated by the Supreme Court
in Strickland v. Washington.  See Goodspeed v. State, 187 S.W.3d
390, 392 (Tex. Crim. App. 2005) (citing Strickland v. Washington, 466
U.S. 668, 687 (1984)); Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim.
App. 1999).  The Strickland test requires the appellant to show that
counsel’s performance was deficient or, in other words, that counsel’s assistance
fell below an objective standard of reasonableness.  Thompson, 9 S.W.3d
at 812; see Strickland, 466 U.S. at 687.  Assuming appellant has
demonstrated deficient assistance, he must then show that there is a reasonable
probability that, but for counsel’s errors, the result would have been
different.  Thompson, 9 S.W.3d at 812; see Strickland, 466 U.S.
at 694.  In determining the validity of appellant’s claim of ineffective
assistance of counsel, “any judicial review must be highly deferential to trial
counsel and avoid the deleterious effects of hindsight.”  Thompson, 9
S.W.3d at 813.

            The burden is on appellant to prove
ineffective assistance of counsel by a preponderance of the evidence.  Id. 
Appellant must overcome the strong presumption that counsel’s conduct fell
within the wide range of reasonable professional assistance and that his
actions could be considered sound trial strategy.  See Strickland, 466
U.S. at 689; Jaynes v. State, 216 S.W.3d 839, 851 (Tex. App.—Corpus
Christi 2006, no pet.).  A reviewing court will not second-guess legitimate
tactical decisions made by trial counsel.  State v. Morales, 253 S.W.3d
686, 696 (Tex. Crim. App. 2008) (“[U]nless there is a record sufficient to
demonstrate that counsel’s conduct was not the product of a strategic or
tactical decision, a reviewing court should presume that trial counsel's
performance was constitutionally adequate . . . .”).  Counsel’s effectiveness
is judged by the totality of the representation, not by isolated acts or
omissions.  Thompson, 9 S.W.3d at 813; Jaynes, 216 S.W.3d at 851. 
An allegation of ineffectiveness must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness.  Bone v.
State, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); Thompson, 9 S.W.3d
at 814 (setting out that “in the vast majority of cases, the undeveloped record
on direct appeal will be insufficient for an appellant to satisfy the dual
prongs of Strickland”); see Jackson v. State, 877 S.W.2d 768,
771-72 (Tex. Crim. App. 1994) (en banc) (stating that “we must presume that
counsel is better positioned than the appellate court to judge the pragmatism
of the particular case, and that he made all significant decisions in the
exercise of reasonable professional judgment” and that “[d]ue to the lack of
evidence in the record concerning trial counsel’s reasons” for the alleged
ineffectiveness, the court was “unable to conclude that appellant’s trial
counsel’s performance was deficient”) (internal quotations omitted).

B.        Analysis

Here, the record is
silent regarding trial counsel’s reasons for not objecting to the letter on the
basis brought forth by Cantu on appeal.  Therefore, Cantu has not overcome the strong
presumption that counsel’s conduct fell within the wide range of reasonable
professional assistance and that his actions could be considered sound trial
strategy.  See Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d at
851.

Nonetheless, Cantu argues
that trial counsel should have objected to Jessica’s letter to Santa pursuant
to rule of evidence 1009.  See Tex.
R. Evid. 1009.  Rule 1009, entitled “Translation of Foreign Language
Documents,” provides that “[a] translation of foreign language documents shall
be admissible upon the affidavit of a qualified translator setting forth the
qualifications of the translator and certifying that the translation is fair
and accurate.”  See id. R.
1009(a).  The “affidavit, along with the translation and the underlying foreign
language documents, shall be served upon all parties at least 45 days prior to
the date of trial.”  Id.  Rule 1009(a) only applies to the written
translation of a foreign language document.  It does not apply to the foreign
language document itself.  In fact, rule 1009(e) states, “[T]his Rule does not
preclude the admission of a translation of foreign language documents at trial
either by live testimony or by deposition testimony of a qualified expert
translator.”  Id.; Peralta v. State, 338 S.W.3d 598, 606 (Tex.
App.—El Paso 2010, no pet.).

Here, no written
translation of the letter to Santa was admitted into evidence; thus, rule 1009(a)
did not apply.  Therefore, any objection by trial counsel on this basis would
have been unfounded; thus, trial counsel was not required to object to the
letter to Santa written in Spanish under rule 1009(a).  See id.; Peralta,
338 S.W.3d at 606.

Rather, at trial, the
trial court’s interpreter translated the letter’s contents to English, which is
permissible under rule 1009(e).  See Peralta, 338 S.W.3d at 606 (“In the
event the time requirements of subsection (a) are not met, a party may
nevertheless introduce the translation at trial either by live testimony or by
deposition testimony of a qualified expert translator.”) (citing Tex. R. Evid. 1009).  Cantu’s trial
counsel did object to the translation, but the basis of the objection was not
included in the record because the actual objection and discussion were off the
record.  After the unrecorded discussion, the trial court stated that the translation
would not be admitted into evidence.  Instead, the trial court gave it to the
jury “as a jury aid.”  The trial court stated, “It’s not going to be in
evidence, it’s to help you as a jury aid.  You will read the letter [written in
Spanish] and you’ll make the decision as to what the letter says.  And [Cantu’s
trial counsel] will be allowed to cross-examine what he thinks is right and
what’s wrong about that letter.”

It is apparent from the
record that trial counsel objected to the live translation of the letter to
Santa and that the trial court granted the relief requested.  Accordingly,
Cantu has not met his burden to show by a preponderance of the evidence that he
was harmed by his trial counsel’s failure to object on the basis of rule 1009. 
See Thompson, 9 S.W.3d at 812; see also Strickland, 466 U.S. at
687.

Cantu also argues that
trial counsel was ineffective by not objecting to admission of the photocopy of
the letter to Santa pursuant to rule of evidence 1002—the best evidence rule.  The
best evidence rule states the general proposition that the original of a
writing, recording, or photograph is required to prove its contents unless
otherwise provided.  See Tex. R.
Evid. 1002; see also Englund v. State, 946 S.W.2d 64, 67 (Tex.
Crim. App. 1997).  The exceptions to the best evidence rule are set out in
rules 1003 and 1004.  Ballard v. State, 23 S.W.3d 178, 181 (Tex. App.—Waco
2000, no pet.).  Rule 1003 provides that a “duplicate is admissible to the same
extent as an original unless . . . a question is raised as
to the authenticity of the original.”  Tex.
R. Evid. 1003.  Cantu does not challenge the authenticity of the
original on appeal.  Moreover, Cantu must show on appeal that the trial court
would have committed error in overruling the objection.  See Ex parte White,
160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (citing Vaughn v. State, 931
S.W.2d 564, 566 (Tex. Crim. App. 1996)).  In this case, the trial court would
not have abused its discretion in concluding that the duplicate copy of
Jessica’s letter to Santa was admissible to the same extent as an original
because the authenticity of the original was not questioned at trial, and Cantu
has not questioned the original’s authenticity on appeal.

Moreover, Cantu has
failed to show how he was prejudiced by the actions of his trial counsel. 
Cantu merely states in his brief that the letter to Santa was “a very important
and pivotal document, because the letter was the catalyst which sparked the
criminal investigation against [him] in this case.”  However, he does not
assert that there is a reasonable probability that, but for counsel’s alleged
error of failing to object pursuant to rule 1009, the result would have been
different.  See Thompson, 9 S.W.3d at 812; see also Tex. R. App. P. 38.1(i).  Furthermore,
Cantu does not argue that he was prejudiced by his trial counsel’s alleged
failure to object to Jessica’s letter to Santa under the best evidence rule.  See
Thompson, 9 S.W.3d at 812; see also Tex. R. App. P. 38.1(i).  Therefore, we conclude that Cantu
has not met his burden of showing by a preponderance of the evidence that he
was prejudiced by his trial counsel’s alleged errors.  Accordingly, we overrule
Cantu’s fourth issue.

V.        Conclusion

            We affirm the trial court’s judgment.

 

_____________________

Rogelio Valdez

                                                                                                Chief
Justice

 

Do not
Publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the


22nd day of August,
2011.

 









[1]
The jury acquitted Cantu of the offense of indecency with a child by sexual
contact.  See Tex. Penal Code Ann.
§ 21.11(a)(1) (West Supp. 2010).





[2]
The names are pseudonyms used in the trial court to protect the identity of the
alleged victims in this case.





[3]
The record shows that the occupants of the home had to pass through Jessica and
Joanna’s bedroom in order to access the only bathroom located in the house.





[4]
The State explained that Jessica’s real name had been removed from the letter
to protect her identity.





[5]
On cross-examination, Joanna testified that she told Lopez that Cantu touched
her “more than one time.”





[6]
C.F.C. testified earlier that she had been informed that an illegal immigrant
that has suffered family abuse in the United States is eligible to apply for
citizenship.  C.F.C. stated that she had already filed the appropriate
paperwork under that rule.





[7]
Cantu specifies in his brief that he is only challenging the first element of
the offense of continuous sexual abuse of a young child.  See Tex. Penal Code Ann. § 21.02 (West
Supp. 2010).





[8]
Because the court of criminal appeals has determined that the Jackson
legal sufficiency standard is the only standard that we should apply in
determining whether the evidence is sufficient to support each element of a
criminal offense, we will not address Cantu’s second issue that the evidence is
factually insufficient to support the verdict.  See Brooks v. State, 323
S.W.3d 893, 902-03, 912 (Tex. Crim. App. 2010) (plurality op.).





[9]
Cantu did not object to the jury charge at trial.





[10]
Cantu has not cited a particular page in Williams from which this Court could
discern his argument and only generally cites Williams with the
introductory signal “see and compare with” and the parenthetical “(unanimity
instruction contained in the application paragraph).” 





[11]
Finding no error in the jury charge, we need not address Cantu’s argument that
he suffered egregious harm.  See Ngo v. State, 175 S.W.3d 738, 743 (Tex.
Crim. App. 2005) (setting out that an appellate court’s “first duty” in
analyzing a jury charge issue is “to decide whether error exist”); Posey v.
State, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998) (providing that the Almanza
harm analysis does not apply unless the appellate court first finds error in
the jury charge); see also Almanza v. State, 686 S.W.2d 157, 171
(Tex.Cr.App.1984) (op. on reh'g) (providing that if error is found in the
charge, an appellate court determines the degree of harm necessary for reversal
depending on whether the appellant preserved error).