

# NUMBER 13-10-00270-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ANDRES ENRIQUE CANTU,            Appellant,

v.

THE STATE OF TEXAS,            Appellee.

### On appeal from the 139th District Court of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Chief Justice Valdez

A jury convicted appellant, Andres Enrique Cantu, of two counts of continuous sexual abuse of a child. *See* TEX. PENAL CODE ANN. § 21.02 (West Supp. 2010).[1] The trial court sentenced Cantu to two concurrent terms of fifty years' confinement. By four

---

[1] The jury acquitted Cantu of the offense of indecency with a child by sexual contact. *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West Supp. 2010).

issues, appellant contends that the evidence was legally and factually insufficient, the trial court submitted an erroneous jury charge, and his trial counsel rendered ineffective assistance. We affirm.

## I. BACKGROUND

C.F.C., Cantu's wife, testified that she has two daughters, Jessica and Joanna Rodriguez.[2] C.F.C. stated that in September 2007, she lived with Cantu, Jessica, Joanna, and her other two children in Pharr, Texas. According to C.F.C., Jessica and Joanna shared a small bedroom containing a bunk bed, where the girls slept, and another bed where C.F.C. sometimes slept.[3]

C.F.C. testified that in August or September 2008, Jessica told her something about Cantu that caused her to become concerned. C.F.C. did not state what Jessica told her. When C.F.C. confronted Cantu with Jessica present, he told her that Jessica was not telling the truth, and Jessica recanted her story. C.F.C. stated that she then left the home with her children. C.F.C. claimed that when she returned home, Cantu left after she asked him to leave. Cantu eventually came back to live in the home.

According to C.F.C., Joanna was in Mexico visiting family when Jessica made the accusation against Cantu. C.F.C. stated that in August or September, after Jessica "told [her] what was going on," C.F.C.'s brother, "Chava," brought Joanna back to the family home and stayed with the family until December. C.F.C. claimed that Cantu returned to the home when Joanna returned from Mexico. C.F.C. testified that in December 2008, she was informed that Jessica had written a letter to Santa.

---

[2] The names are pseudonyms used in the trial court to protect the identity of the alleged victims in this case.

[3] The record shows that the occupants of the home had to pass through Jessica and Joanna's bedroom in order to access the only bathroom located in the house.

2

Jessica, who was ten at the time of Cantu's trial, testified that in 2008, she lived in Pharr with C.F.C., Cantu, Joanna, and her two brothers. Jessica stated that she sometimes slept in the top bunk bed and sometimes she slept on the bottom bunk bed. According to Jessica, Chava stayed with the family for approximately three months.

The State asked Jessica to identify a letter written in Spanish to Santa. Jessica stated that, although the letter was a photo copy and her signature was missing, it was the letter she had written in December 2008.[4] The trial court admitted the letter into evidence as State's exhibit 1. Cantu's counsel stated that he had no objections to admission of the letter. Jessica then read the letter in Spanish into the record, and the interpreter orally translated the letter to English as follows:

> Dear Santa, I want you to bring me happiness bring me peace and tell my stepfather not to touch me anymore. And make me change because you have not found out that I make life impossible and for me to help my mother with the chores and to help with my brother to change the diapers. I wish I had with me by my side my true father. That is what I ask of you. I believe it is five. Thank you.

Cantu's trial counsel then stated that he wanted to "file an objection." Following a bench conference that was not transcribed by the court reporter, the trial court stated that the letter would be admitted into evidence. Cantu's counsel then stated that in addition to his off-the-record objection, he was objecting to the letter on the basis that it was "not properly interpreted." The trial court then stated:

> There will be a translation given to you as a jury aid. It's not going to be in evidence[;] it's to help you as a jury aid. You will read that letter and you'll make the decision as to what the letter says. Okay. And the interpretation, [Cantu's trial counsel] will be allowed to cross-examine what he thinks is right and what's wrong about that letter.

---

[4] The State explained that Jessica's real name had been removed from the letter to protect her identity.

3

Cantu's trial counsel stated that the interpreter had not "shown his experience and his education." The trial court replied, "He's a certified interpreter for this court" and pointed out that the interpreter had not been "challenged." Defense counsel replied, "That's fine, Your Honor."

Jessica then testified that in the letter she wrote, "*dile a mi padrasto que no me este tocando.*" The interpreter translated the meaning as, "Tell my stepfather not to touch me anymore." When the State asked, "Jessica[,] who were you asking to stop touching you?", she responded, "To my stepfather. . . . Cantu." Jessica stated that she had informed her mother prior to writing the letter to Santa that Cantu had been touching her. Then Jessica explained that she did not remember what happened after she told her mother about Cantu touching her. Jessica also believed that her mother was afraid after she told her Cantu was touching her.

When the State asked, "And from the time you were eight years old, to the date you wrote this letter to Santa in class, did [Cantu] ever touch you on your private parts," Jessica replied, "Yes." Jessica then claimed that Cantu touched her in her "private parts" with his hand more than two times. However, Jessica did not know if Cantu touched her more than five times. Jessica testified that she told her mother that Cantu was touching her before her uncle Chava came to stay with the family. Jessica pointed to the genital area of a doll when asked to show the jury where Cantu touched her. Jessica stated that sometimes Cantu would touch her underneath her clothes and sometimes he would touch her over her clothes. Jessica testified that she felt "bad" and was afraid when Cantu would touch her. According to Jessica, the touching usually occurred at night while she was in bed; however, she also recalled an incident where

4

Cantu touched her legs and "middle part" while they were in a small swimming pool. Jessica stated that Cantu also touched her breast one time "in the room of [her] mom when [she] was passing [walking by]."

Debbie Lopez, a counselor at Jessica's former elementary school, testified that after reading Jessica's letter to Santa, she asked Jessica to explain what was happening. Lopez stated that Jessica told her that Cantu had been touching her and her sister, Joanna. According to Lopez, Jessica said that Cantu "would get on top of her at night under the covers." When Lopez asked where Cantu touched Jessica, Jessica replied, "where I go to the bathroom." Lopez stated that Jessica also stated that Cantu touched her breast and kissed her. Lopez claimed that although she did not ask Jessica how many times Cantu touched her, she inferred that the inappropriate touching occurred more than once because Jessica told her about several "scenarios" concerning when the touching happened. Lopez testified as follows:

> Well, I asked her when it had happened, and she kind of told me scenarios. Like, one time she said that she was in bed and her sister was there in the bed, and that he had gone over to the room, right. And I asked her, well if your sister was there, how come she didn't hear this? Was she out? She says, no he's very quiet, was one time.

> And then she said something else of [sic] in the mom's room. That in the mom's room, they were in there, I believe, and he's walking in the hallway that he had, I think put his hands around her waist, or something like that, and touched her breasts passing by in the hallway also. So it was like two or three different times that she was telling me.

Lopez then spoke with Joanna. According to Lopez, once she told Joanna that she knew what was happening, Joanna told her that Cantu touched her and her sister, Jessica, and attempted to touch Joanna in the shower or while she was bathing. However, Lopez then stated that she could not remember if Joanna told her that Cantu

5

actually touched her. Lopez testified that Jessica told her that one night she woke up and saw Cantu on top of Jessica and that Cantu "had his hand in her pants." On cross-examination, defense counsel asked, "[Lopez], how many times did Joanna tell you that [Cantu] actually touched her," Lopez replied, "She told me one specific time."[5] Lopez stated that Joanna then told her that on several other occasions, Cantu attempted to touch her.

Joanna, an eleven-year-old child at the time of trial, testified that in December 2008, she lived in Pharr with her family and lived there for approximately eight years. Joanna stated that she slept on a bunk bed with her sister, Jessica. The following exchange then occurred:

[The State:]: And during the time from when you were nine years old in September of 2007, up until the—up until December 2008, when your sister wrote that letter in school did anybody ever touch you in a way that they shouldn't have?

Joanna: Cantu.

[The State]: And how many times would you say that that happened September [the inappropriate touching] between September of 2007 and when you were nine years old?

Joanna: A lot of times.

[The State]: Up to December of 2008? A lot of times?

Joanna: Uh-huh.

Joanna then stated that Cantu touched her more than ten times. Joanna testified that Cantu mostly touched her during the night with his hands "[i]n [her] private parts" underneath her clothes. When asked to point to the private parts of a doll, Joanna

---

[5] On cross-examination, Joanna testified that she told Lopez that Cantu touched her "more than one time."

pointed to the genital area. Joanna stated that Cantu put his finger in her private parts and she asked him to stop because it felt awkward. According to Joanna, sometimes Cantu stopped touching her when she asked him to stop and sometimes he would not stop.

Joanna also saw Cantu touching Jessica on her private parts "various times." The State asked, "More than two times," and Joanna said, "Yes." Joanna stated that she believed that Cantu touched her during the time that Chava stayed with the family and that he stayed with them for about three or four months.

Cantu testified on his own behalf that C.F.C. and Jessica are in the United States illegally. Cantu stated, that five years after he married C.F.C., he attempted to help her "fix her papers" but that, because C.F.C. had allegedly been deported three times, she was not eligible to become a citizen. During his testimony, Cantu stated that he believed that Joanna made up the accusations against him in order to "help her mother [C.F.C.] become a legal resident alien."[6]

Cantu denied going into the girls' room at night and touching Joanna's private parts on several occasions. When asked if Joanna was lying about the touching, Cantu responded, "I don't believe that's possible, sir. I—I've never—I would never ever think of doing something like that to them." Cantu denied touching Jessica inappropriately. On cross-examination, Cantu denied that C.F.C. had confronted him about touching Jessica before she wrote the letter to Santa and that he was "kicked out of [his] house for a couple of weeks."

---

[6] C.F.C. testified earlier that she had been informed that an illegal immigrant that has suffered family abuse in the United States is eligible to apply for citizenship. C.F.C. stated that she had already filed the appropriate paperwork under that rule.

7

Cantu also called Lopez to testify. Lopez reiterated that Joanna told her that Cantu only touched her one time and that she did not specify where he touched her.

## II. SUFFICIENCY OF THE EVIDENCE

By his first and second issues, Cantu contends that the evidence is legally and factually insufficient to support the verdict. Specifically, Cantu argues that the evidence did not show that the sexual abuse occurred during a time span that was thirty days or more in duration.[7]

### A. Standard of Review and Applicable Law

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. Crim. App. 2010) (plurality op.). Accordingly, we review Cantu's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review. *Id.* at 906-07, 912. Moreover, we do not refer separately to legal or factual sufficiency and will only analyze Cantu's issues under the *Jackson* standard. *See id.* at 985 (concluding that there is no meaningful distinction between a legal and factual sufficiency analysis).

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

---

[7] Cantu specifies in his brief that he is only challenging the first element of the offense of continuous sexual abuse of a young child. *See* TEX. PENAL CODE ANN. § 21.02 (West Supp. 2010).

*Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (explaining that in the *Jackson* standard we consider "all of the evidence in the light most favorable to the verdict," and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The elements of the offense of continuous sexual abuse of a child are:

> "(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age." Thus, to convict the appellant of this offense, the jury must have found that appellant committed at least two acts of sexual abuse over a period of at least thirty days.

*Render v. State*, 316 S.W.3d 846, 857 (Tex. App.—Dallas 2010, pet. ref'd) (quoting TEX. PENAL CODE ANN. § 21.02(b)).

9

**B.    Thirty Days or More in Duration**

By his first issue, Cantu complains that the evidence was insufficient to establish that the sexual abuse of Jessica and Joanna took place over a span of thirty or more days. Cantu states he will "assume that the [S]tate proved all of the elements of the offense with the exception of the very first and most pivotal element: the time frame." Specifically, Cantu argues that Jessica's "references [to a time frame] were general in nature and she never specified that [Cantu] had touched her inappropriately during the time line the [S]tate had alleged in its indictment [from September 1, 2007 to December 10, 2008]." Cantu further argues that Joanna "also testified about the time line in broad generalities, and she never testified that [Cantu] had touched her inappropriately during the time period specified in the indictment."

C.F.C. testified that in August or September 2008, Jessica told her something about Cantu that caused her to become concerned and to confront Cantu. According to C.F.C., Joanna was in Mexico visiting family at this time. Jessica testified that she told her mother that Cantu had touched her private parts before Chava visited the family. C.F.C. stated that Chava visited the family after Jessica "told [her] what was going on." Jessica testified that Cantu touched her breasts before Chava came to visit the family.

Jessica then wrote a letter to Santa in December 2008. Jessica testified that when she wrote the letter, she was asking for Santa to "tell" Cantu not to touch her anymore. Jessica stated that Cantu touched her more than two times "from the time" she was eight years old "to the date" she wrote the letter to Santa. Joanna testified that she saw Cantu touch Jessica's private parts "various times." On cross-examination,

10

Jessica claimed that while Chava slept in her bedroom, she remembered a "body, or a person" come into her room.

When asked if someone touched her inappropriately during the time from September 2007 until December 2008, Joanna replied that Cantu did so "[a] lot of times." Joanna testified that Cantu touched her private parts more than ten times.

Although the child victims in this case were unable to articulate the exact times and dates that Cantu touched their private parts, there was sufficient evidence to allow the jury to determine whether the crimes occurred during a period that was thirty days or more. *See Williams v. State*, 305 S.W.3d 886, 890 n.7 (Tex. App.—Fort Worth 2010, no pet.) ("Arguably this [the child's inability to articulate the exact dates when the abuse occurred] is precisely the kind of situation the Legislature considered when enacting Section 21.02 of the Texas Penal Code.") (citing *Dixon v. State*, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring)). The testimony established that Jessica was sexually abused by Cantu prior to Chava's visit and continued though Chava's stay with the family, a period of at least three months. The testimony further established that Cantu sexually abused Joanna from September 2007 until December 2008. Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Cantu touched Jessica and Joanna on their private parts during a period that is thirty or more days in duration. *See Jackson*, 443 U.S. at 319; *see also Brooks*, 323 S.W.3d at 898-99. Therefore, the evidence was legally sufficient to support both counts of continuous sexual abuse of a child. We overrule Cantu's first issue. [8]

---

[8] Because the court of criminal appeals has determined that the *Jackson* legal sufficiency standard is the only standard that we should apply in determining whether the evidence is sufficient to

11

### III.    JURY CHARGE ERROR

By his third issue, Cantu contends that the trial court "reversibly erred in submitting the charge to the jury without including separate unanimity instructions in the application paragraphs as to counts one and two."[9]  Specifically, Cantu asserts that "the jury charge contained only a general instruction informing the jury that its verdict had to be reached by a unanimous vote; however, glaringly absent from the charge was a separate unanimity instruction in the application paragraph itself."  Cantu then claims that the "jury unanimity instruction should have been included and incorporated into the application paragraph of the jury charge as to both counts one and two."

Cantu cites no authority, and we find none, requiring a separate unanimity instruction in the application paragraph when the charged offense is continuous sexual abuse of a child.  The only authority Cantu cites is *Williams v. State*; however, Cantu does not provide a clear argument explaining how *Williams* supports his assertions. *See generally* 305 S.W.3d at 886-93.  Cantu's claims are not clearly set out.[10]  *See* TEX. R. APP. P. 38.1(i).  Therefore, Cantu's third issue is inadequately briefed.  *See id.*

Nonetheless, we note that the court in *Williams* recognized that penal code section 21.02 states:

> If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed.  The

---

support each element of a criminal offense, we will not address Cantu's second issue that the evidence is factually insufficient to support the verdict.  *See Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. Crim. App. 2010) (plurality op.).

[9] Cantu did not object to the jury charge at trial.

[10] Cantu has not cited a particular page in *Williams* from which this Court could discern his argument and only generally cites *Williams* with the introductory signal "see and compare with" and the parenthetical "(unanimity instruction contained in the application paragraph)."

> jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

*Id.* at 892. The court then concluded that the jury must only reach a unanimous verdict concerning whether the defendant committed two or more acts of sexual abuse during a period that is thirty days or more and that the jury did not have to unanimously agree on which specific acts of sexual abuse were committed. *Id.* The *Williams* Court did not conclude that the unanimity instruction must be included in the application paragraph. It merely concluded that the instruction, which happened to be in the application paragraph, was not erroneous. *Id.* Therefore, *Williams* does not support Cantu's claims that the trial court's jury charge was erroneous.

Moreover, section 21.02 creates a single element, a "series" of sexual abuse acts, and does not make each act a separate offense. *See* Tex. Penal Code Ann. § 21.02; *Reckart v. State*, 323 S.W.3d 588, 601 (Tex. App.—Corpus Christi 2010, pet. ref'd) ("Section 21.02 allows the State to seek a single conviction for a 'series' of acts of sexual abuse with evidence that, during the relevant time period, the accused committed two or more different acts that section 21.02 defines as means of committing a single criminal offense and not as two or more separate criminal offenses. Thus, each act of sexual abuse is not an 'element' of the offense; rather, the 'series' is the element of the offense, and the acts of sexual abuse are merely the manner and means of committing an element of the offense.") (internal citations omitted); *see also Lewis v. State*, No. 02-10-00004-CR, 2011 Tex. App. LEXIS 5455, at *16 (Tex. App.—Fort Worth July 14, 2011, no pet. h.) (mem. op., not designated for publication) (explaining that unlike the case of the State charging two separate offenses in the disjunctive, section 21.02 "does not make each act a separate element but creates a single element, a

13

'series' of sexual abuse.  Jurors must agree unanimously only that the defendant, during a period of thirty or more days, committed two or more acts of sexual abuse") (internal citations omitted).  The statute requires only that jurors unanimously agree that the defendant, during a period of thirty or more days, committed two or more acts of sexual abuse.  *Reckart*, 323 S.W.3d at 601; *see* TEX. PENAL CODE ANN. § 21.02; *see also Lewis*, 2011 Tex. App. LEXIS 5455, at *16.

> Here, the jury charge for both counts stated:
>
> You are instructed that as members of the jury you are not required to agree unanimously on which specific acts of sexual abuse, if any, were committed by the Defendant or the exact date when those acts were committed, if any.  The jury must agree unanimously that the Defendant, during a period that was 30 or more days in duration, committed two or more acts of sexual abuse as that term has been previously defined.

This instruction, although not included in the application paragraph, sets out the law as stated in section 21.02.  *See* TEX. PENAL CODE ANN. § 21.02.  Therefore, the jury was properly instructed that in order to find Cantu guilty of the charged offense, it was required to unanimously agree that during a period that was thirty or more days in duration, Cantu committed two or more acts of sexual abuse.  "Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act."  *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); *see Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007) (holding unanimity ensures all jurors reach consensus on same act for conviction).  Here, the jury charge instructed the jury that it must agree that Cantu committed the same, single, specific criminal act, *i.e.*, a "series" of acts of sexual abuse.  *See Reckart*, 323 S.W.3d at 601.  Therefore, we find no error in the jury charge.[11]  Accordingly, we overrule Cantu's third issue.

---

[11] Finding no error in the jury charge, we need not address Cantu's argument that he suffered

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

By his fourth issue, Cantu contends that his trial counsel rendered ineffective assistance by failing "to object to the 'Santa Letter,' written entirely in the Spanish language" and by failing to object to "the State's introduction of the photocopy of the 'Santa Letter.'"

## A.    Standard of Review and Applicable Law

Ineffective assistance of counsel claims are evaluated under the two-part test articulated by the Supreme Court in *Strickland v. Washington*.  *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  The *Strickland* test requires the appellant to show that counsel's performance was deficient or, in other words, that counsel's assistance fell below an objective standard of reasonableness.  *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 687.  Assuming appellant has demonstrated deficient assistance, he must then show that there is a reasonable probability that, but for counsel's errors, the result would have been different.  *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 694.  In determining the validity of appellant's claim of ineffective assistance of counsel, "any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight."  *Thompson*, 9 S.W.3d at 813.

---

egregious harm.  *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (setting out that an appellate court's "first duty" in analyzing a jury charge issue is "to decide whether error exist"); *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998) (providing that the *Almanza* harm analysis does not apply unless the appellate court first finds error in the jury charge); *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1984) (op. on reh'g) (providing that if error is found in the charge, an appellate court determines the degree of harm necessary for reversal depending on whether the appellant preserved error).

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) ("[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate . . . ."). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 814 (setting out that "in the vast majority of cases, the undeveloped record on direct appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland*"); *see Jackson v. State*, 877 S.W.2d 768, 771-72 (Tex. Crim. App. 1994) (en banc) (stating that "we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment" and that "[d]ue to the lack of evidence in the record concerning trial counsel's reasons" for the alleged ineffectiveness, the court was "unable to conclude that appellant's trial counsel's performance was deficient") (internal quotations omitted).

16

**B.    Analysis**

Here, the record is silent regarding trial counsel's reasons for not objecting to the letter on the basis brought forth by Cantu on appeal. Therefore, Cantu has not overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.

Nonetheless, Cantu argues that trial counsel should have objected to Jessica's letter to Santa pursuant to rule of evidence 1009. *See* TEX. R. EVID. 1009. Rule 1009, entitled "Translation of Foreign Language Documents," provides that "[a] translation of foreign language documents shall be admissible upon the affidavit of a qualified translator setting forth the qualifications of the translator and certifying that the translation is fair and accurate." *See id.* R. 1009(a). The "affidavit, along with the translation and the underlying foreign language documents, shall be served upon all parties at least 45 days prior to the date of trial." *Id.* Rule 1009(a) only applies to the written translation of a foreign language document. It does not apply to the foreign language document itself. In fact, rule 1009(e) states, "[T]his Rule does not preclude the admission of a translation of foreign language documents at trial either by live testimony or by deposition testimony of a qualified expert translator." *Id.*; *Peralta v. State*, 338 S.W.3d 598, 606 (Tex. App.—El Paso 2010, no pet.).

Here, no written translation of the letter to Santa was admitted into evidence; thus, rule 1009(a) did not apply. Therefore, any objection by trial counsel on this basis would have been unfounded; thus, trial counsel was not required to object to the letter to Santa written in Spanish under rule 1009(a). *See id.*; *Peralta*, 338 S.W.3d at 606.

17

Rather, at trial, the trial court's interpreter translated the letter's contents to English, which is permissible under rule 1009(e). *See Peralta*, 338 S.W.3d at 606 ("In the event the time requirements of subsection (a) are not met, a party may nevertheless introduce the translation at trial either by live testimony or by deposition testimony of a qualified expert translator.") (citing TEX. R. EVID. 1009). Cantu's trial counsel did object to the translation, but the basis of the objection was not included in the record because the actual objection and discussion were off the record. After the unrecorded discussion, the trial court stated that the translation would not be admitted into evidence. Instead, the trial court gave it to the jury "as a jury aid." The trial court stated, "It's not going to be in evidence, it's to help you as a jury aid. You will read the letter [written in Spanish] and you'll make the decision as to what the letter says. And [Cantu's trial counsel] will be allowed to cross-examine what he thinks is right and what's wrong about that letter."

It is apparent from the record that trial counsel objected to the live translation of the letter to Santa and that the trial court granted the relief requested. Accordingly, Cantu has not met his burden to show by a preponderance of the evidence that he was harmed by his trial counsel's failure to object on the basis of rule 1009. *See Thompson*, 9 S.W.3d at 812; *see also Strickland*, 466 U.S. at 687.

Cantu also argues that trial counsel was ineffective by not objecting to admission of the photocopy of the letter to Santa pursuant to rule of evidence 1002—the best evidence rule. The best evidence rule states the general proposition that the original of a writing, recording, or photograph is required to prove its contents unless otherwise provided. *See* TEX. R. EVID. 1002; *see also Englund v. State*, 946 S.W.2d 64, 67 (Tex.

18

Crim. App. 1997). The exceptions to the best evidence rule are set out in rules 1003 and 1004. *Ballard v. State*, 23 S.W.3d 178, 181 (Tex. App.—Waco 2000, no pet.). Rule 1003 provides that a "duplicate is admissible to the same extent as an original unless . . . a question is raised as to the authenticity of the original." TEX. R. EVID. 1003. Cantu does not challenge the authenticity of the original on appeal. Moreover, Cantu must show on appeal that the trial court would have committed error in overruling the objection. *See Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (citing *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996)). In this case, the trial court would not have abused its discretion in concluding that the duplicate copy of Jessica's letter to Santa was admissible to the same extent as an original because the authenticity of the original was not questioned at trial, and Cantu has not questioned the original's authenticity on appeal.

Moreover, Cantu has failed to show how he was prejudiced by the actions of his trial counsel. Cantu merely states in his brief that the letter to Santa was "a very important and pivotal document, because the letter was the catalyst which sparked the criminal investigation against [him] in this case." However, he does not assert that there is a reasonable probability that, but for counsel's alleged error of failing to object pursuant to rule 1009, the result would have been different. *See Thompson*, 9 S.W.3d at 812; *see also* TEX. R. APP. P. 38.1(i). Furthermore, Cantu does not argue that he was prejudiced by his trial counsel's alleged failure to object to Jessica's letter to Santa under the best evidence rule. *See Thompson*, 9 S.W.3d at 812; *see also* TEX. R. APP. P. 38.1(i). Therefore, we conclude that Cantu has not met his burden of showing by a

19

preponderance of the evidence that he was prejudiced by his trial counsel's alleged errors. Accordingly, we overrule Cantu's fourth issue.

## V.    CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
22nd day of August, 2011.