

# NUMBER 13-17-00221-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**KELLY MCKINLEY SHELTON,**                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                          **Appellee.**

---

### On appeal from the 207th District Court of Comal County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Contreras, Longoria, and Hinojosa
### Memorandum Opinion by Justice Contreras

Appellant Kelly McKinley Shelton appeals his conviction for continuous sexual abuse of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 21.02 (West, Westlaw through 2017 1st C.S.). By one issue, Shelton argues the evidence was legally insufficient to support his conviction. We affirm.

# I.    BACKGROUND[1]

Shelton is the maternal grandfather of K.L. and of her older half-sister K.R.[2] Originally, Shelton and his wife Vicki had custody of both girls.  This changed, however, when R.S., K.R.'s father, regained managing conservatorship of K.R.  K.L., on the other hand, remained in the custody of Shelton and his wife, with K.L.'s mother partly involved.

On October 22, 2013, Shelton was indicted on two counts.  Count one was for continuous sexual abuse of a child, and it alleged that he committed two or more of the underlying actions of sexual abuse during a period that was thirty days or more:  (1) aggravated sexual assault of K.L. resulting from the penetration of K.L.'s mouth by Shelton's sexual organ; (2) aggravated sexual assault of K.L. resulting from the contact of K.L.'s mouth with Shelton's sexual organ; (3) indecency with a child resulting from the touching of K.L.'s genitals by Shelton's hands or fingers; and (4) indecency with a child resulting from the touching of K.L.'s body with Shelton's genitals.  *See id.* §§ 21.02, 21.11, 22.011, 22.021 (West, Westlaw through 2017 1st C.S.).  Count two alleged two instances of aggravated sexual assault in two paragraphs:  (1) Shelton caused the penetration of K.L.'s mouth by his sexual organ; and (2) Shelton caused his sexual organ to contact the mouth of K.L.  *See id.* § 22.021.

Shelton pleaded not guilty and proceeded to trial.  By the time of trial, Shelton had filed for divorce and ceased living with K.L., K.L.'s mother, and K.L.'s maternal

---

[1] Pursuant to a docket-equalization order issued by the Supreme Court of Texas, this case was transferred to this Court from the Third Court of Appeals in Austin.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2017 1st C.S.).

[2] We use aliases to protect the minors' identities.  *See* TEX. R. APP. P. 9.9 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases."); *Salazar v. State*, __ S.W.3d __ , __ n.1, No. 13-17-00579-CR, 2018 WL 3655572, at *1 n.1 (Tex. App.—Corpus Christi Aug. 2, 2018, no pet. h.).

grandmother (Vicki) at the home where the alleged incidents occurred. The following individuals testified before the jury: R.S., K.L., K.R., Tara Kvanvig-Garza, and Shelton. We will summarize the relevant parts of each witness's testimony.

**A.    R.S.**

R.S. testified that he is the biological father of K.R. and that he looks after K.L. as if she was his biological daughter. According to R.S., shortly after K.R. was born, he was sent to jail for a drug-related offense and subsequently went into a drug rehab program for a total period of about ten months. While he was away, K.R.'s mother became pregnant with K.L. After his release, R.S. worked towards regaining full custody of K.R, which he achieved when K.R. was three years old, and she began living with him full-time. After R.S. gained full custody of K.R., the sisters (K.L. and K.R.) continued to spend time together either at Shelton's home or at R.S.'s home.

When K.R. was five, sometime in 2009, R.S. learned that Shelton had been showering with K.R. and K.L.; K.L. was almost three years old at the time. R.S. spoke to Vicki and told her that he did not want Shelton to take showers with the girls. Vicki told R.S. that Shelton was wearing shorts when he was in the shower with them, and R.S. testified that he felt as if the matter was resolved at that point.

In April of 2012, K.L. was visiting K.R. when R.S. went into the bathroom to take a shower. While R.S. was in the shower, K.L. came into the bathroom and tried to pull back the shower curtain. R.S. told K.L. that she was not allowed to do that and asked her why she would do so, and K.L. responded that her grandfather let them see him in the shower. R.S. explained to K.L. that it was not appropriate for her to see him in the shower, which

3

caused her to get mad, slam the door, and exit the bathroom. R.S. testified that K.L. was "visibly mad" and that she was five or six at the time of this incident.

R.S. also spoke with K.R., and K.R. told him that Shelton had been showering with both girls "since way back before the first showering incident that [R.S.] was aware of." K.R. also told R.S. that Shelton was not wearing shorts in the shower; this was the first time R.S. heard that Shelton showered naked with the girls. K.R. was "about seven years old" at the time she revealed this to R.S., and she also informed him that Shelton would urinate in the shower while he and the girls were in there. R.S. testified that, at the time he found out Shelton was showering naked with the girls, the girls were capable and old enough to wash and clean themselves without help. R.S. stated that, in his eyes, there was no reason for a grown man to shower with K.R. and that K.R. was able to completely shower independently and clean herself since "she was three or four." R.S. testified that when K.L. would stay over while visiting K.R., R.S. would run a bath for her, and K.L. would not need any other assistance, "[b]esides yelling at me for a towel[.]" After R.S. learned of the naked showers with Shelton, K.R. did not return to visit K.L. at Shelton's home while Shelton continued to live there. R.S. filed a report regarding this incident with the police, and the girls were eventually taken for forensic interviews.

**B.    K.L.**

K.L. was ten years old at the time of trial. She testified that she now lives with her mom and her grandmother. At first, K.L. testified that she could not remember the time when she lived with Shelton and that she "forgot." She also could not remember the last time she had seen Shelton or whether she had ever talked to a "lady" about her relationship with her grandfather.

4

K.L. was then shown a video of her interview with Sara Cantu[3] to refresh her memory. After watching the video, K.L. testified that she did in fact remember the time when Shelton lived with them. She said she remembered Shelton's bedroom was upstairs and that her grandmother's bedroom was downstairs. She also said she remembered seeing Shelton's private parts. The State then asked, "Can you tell us about that occasion?", and K.L. answered, "Do we have to tell that story?" Immediately after, K.L. stated that she did not remember that part. K.L. acknowledged that she did not want to talk about the things discussed between her and Cantu in the video.

When asked to described Shelton's private parts, K.L. stated "it was big" and that it looked like a "wiener." K.L. stated she never touched Shelton's private parts and that Shelton never touched her with his private part. K.L. said she did not remember Shelton putting his private part up to or in her mouth and, when asked by the State whether she remembered telling anyone that Shelton had done so, K.L. answered "no." K.L. finished her testimony by saying that she did not remember: anyone in the bathroom when she would shower, Shelton showering with her, or K.R. coming over to visit while Shelton was still living in the house.

**C.    K.R.**

K.R. was twelve years old at the time of trial. She testified that she would go over to Shelton's house every other weekend while Shelton lived there. K.R. explained that she had to stop going over to Shelton's house because "grandpa showered with me and my sister." She said she remembered that Shelton was present when she and K.L.

---

[3] It is unclear from the record who Sara Cantu is, but, given the context, it seems she performed one of the forensic interviews with K.L. or was one of the outcry witnesses to whom K.L. disclosed some allegations of sexual abuse involving Shelton.

showered and that "he would wash us sometimes and he would become quickly undressed. That's about it." K.R. testified that Shelton would touch her or K.L. "only to wash" them. K.R. testified Shelton touched her private areas used for number one and number two, as well as her chest area. K.R. stated Shelton touched K.L. in the same areas.

When asked if K.R. ever touched Shelton while in the shower, she answered "probably on his back to wash it, but that's pretty much what I remember." She explained that she meant she would wash his shoulders by stepping on a stool. K.R. stated she did not remember having to wash his front part and that K.L. would maybe "wash his lower leg or something." The State asked K.R. if she would do most of the washing, and K.R. answered "Not mostly. We'd do it together." K.R. testified that the showers happened more than once and stated "I think maybe every day—like maybe every day whenever we—it was like shower time." She explained that this occurred in the summer time and went on into the fall when she was in school.

K.R. remembered telling her dad about the showers and "him getting all worried and freaked out and then calling Grammy, I'm pretty sure, or one of them." K.R. recalled giving an interview at a Children's Advocacy Center (CAC) and stated she was nervous to testify at the trial court because Shelton had threatened her. K.R. explained Shelton pointed a handgun at her, told her that he didn't want her to tell anyone about the showers, and threatened to use the gun if she did. When asked by defense counsel about why she didn't mention the gun threat during her interview at the CAC, K.R. responded it was because she was worried to talk about it.

D.    Tara Kvanvig-Garza

6

Garza is a licensed professional counselor who sometimes provides counseling services for Child Protective Services. She was K.L.'s counselor after R.S. filed the police report. Garza met with K.L. for a total of forty-nine sessions during a period of a year and a half.[4]

Garza explained that K.L. could distinguish truth from lies. She explained K.L. was exhibiting anxiety, fear, and depression at school and at home. According to Garza, K.L. had "pretty high anxiety, reports of nightmares, difficulty sleeping through the night, bathroom behaviors that were causing concern for the foster parent."

As to the eighth session between Garza and K.L., which occurred on January 17, 2013, the following exchanged occurred:

[State]: What was [K.L.] dealing with as far as emotional issues or signs or symptoms at that time?

[Garza]: General mistrust of people, reports of feeling scared, feeling like her environment was out of control. . . . She had a nightmare. She said she wanted to draw about it. It was about a ghost coming up to take her away. She disclosed more about that, actually began to share more about her dreams and what was happening rather than saying she was having them. She started to be more specific about what was occurring in the dreams.

[State]: Okay. Was there any significance that you saw in the dreams as they were being reported?

[Garza]: Yes, sir. In her dreams she specifically reported a big bear, stuffed animal character, that she used to show that it was in

---

[4] At a hearing outside the presence of the jury, K.L. recanted the allegations of sexual abuse by Shelton that she disclosed to Garza; K.L. stated "I might have said that, but I don't think that's true because all kids lie at a young age." During Garza's testimony, defense counsel objected to Garza's testimony regarding these allegations on 403 and 803 grounds. *See* TEX. R. EVID. 403, 803. At another hearing outside the presence of the jury, the court noted a lack of sources corroborating these allegations, statements made before the presiding judge in a separate but related civil case, and the fact that K.L. used the word "lie." The trial court questioned the reliability of Garza's testimony as to who the abuser was in the allegations of sexual abuse disclosed to her and sustained defense counsel's objections, but it allowed Garza to testify as to the red flags of sexual abuse she observed during her counseling of K.L.

her dreams. It would sniff and lick her genitalia. She used the bear to act out what was occurring in her dreams.

[State]: Would this be a common type of report for a five-year-old child?

[Garza]: No, sir.

In regard to their subsequent session on January 31, 2013:

[State]: Okay. Can you tell us what happened during the course of that session.

[Garza]: [K.L.] was worried about getting in trouble for making a mess at school with the toys, but she chose to play with the—with the figurines. . . . She chose mostly to play with animals. A lot of times she would cringe or shake off her hands when she touched the people figurines. That was something that was a continual thing for her. She had play things that were becoming more advanced, more developed. She would set up situations where there was a vulnerable play item that had to be rescued. Usually one of the dangerous creatures would become a friend or one of the people who was rescuing would later become a dangerous creature. So there was this theme of thwarted rescue happening over and over.

Then, regarding a session on February 7, 2013:

[State]: What happened during the course of your February 7th session?

[Garza]: We—[K.L.] chose a release game which involved using bean bags to toss into a goal or a target while she was identifying triggers, things that were causing anger, fear, sadness, worry, happiness. . . . She talked about nightmares of having someone come into her room again at nighttime. . . . She, in this section, talked about feeling angry at her grandparents for fighting. She was able to explain feeling like they fought all the time, particularly over her. She was able to say that the things that they fought about is where [K.L.] would sleep, where she would be.

Garza also testified about the red flags of sexual abuse which she observed during her interactions with K.L.:

8

[State]: Specifically with regard to [K.L.], were there any other red flags of abuse that you saw?

[Garza]: Other than the outcry, she also demonstrated sexual acting out, sexual aggression, particularly towards the sister; urinating on her sister; other bathroom behaviors that could be a behavioral indication of victimization.

[State]: Are those bathroom behaviors identified as high indicators as well?

[Garza]: Yes, sir.

[State]: Were there any other high indicators that you saw?

[Garza]: Just in general sexual knowledge, awareness of anatomy of the opposite gender and things that occur during sexual experiences, during—with the anatomy.

. . .

[State]: So specifically with regard to [K.L.], what signs or behaviors of a moderate level of probability did you note?

[Garza]: She had significant sleep disturbance, difficulty falling asleep, staying asleep, as well was frequent waking with nightmares. She also had the enuresis, wetting the bed at nighttime frequently. She demonstrated self-destructive behaviors, that self-sabotage and risk-taking, impulsive and destructible, difficult settling in, kind of a hypervigilant state, always looking and watching, oversensitive to sounds, oversensitive to activities around her, unable to—to tune those out.

[State]: Were there any other lower-level indicators that you noted?

[Garza]: Cruelty to the animal that was in the house, to the pets; school difficulties. She had difficulty being able to function academically as well as social difficulties relating to peers.

## E. Directed Verdict

The State's case in chief finished with Garza's testimony, and Shelton moved for a directed verdict on all matters before the jury. The trial court granted Shelton's motion for directed verdict as to the first, second, and fourth allegation contained in count one

9

and as to both paragraphs under count two.  Thus, the only remaining charge before the jury alleged that, on two or more instances during a period longer than thirty days,  "Kelly Shelton did then and there, with the intent to arouse or gratify the sexual desire of any person, engage in sexual contact with the said [K.L.] by touching the genitals or part of the genitals of [K.L.] with the hands or fingers of said Kelly Shelton."

## F.      Shelton

Shelton testified he is a former police officer and air force firefighter.  He confirmed that he and his wife had custody of K.L. and K.R. and that the girls had lived with them. He testified he had a pool at his home; that he would go swimming with both girls because "[t]hey were babies"; and that he would take a shower with the girls after getting out of the pool.  Defense counsel questioned Shelton about the surrounding circumstances:

| [Counsel]: | Where would Vicki be? |
|---|---|
| [Shelton]: | In the master bathroom, but she would be waiting for me to finish rinsing the girls—washing the girls off.  I'd pass them out to her and she'd take them one at a time, dry them off, start blow-drying their hair, getting them— it's a chemical pool, so you've got to rinse that off when you get out of the pool. |
| [Counsel]: | So Grandma or Vicki would have been present while these showers were going on? |
| [Shelton]: | Yes, sir. |
| [Counsel]: | Is there any time that you would have ever been naked while you were rinsing them off? |
| [Shelton]: | I believe so, yes. |
| [Counsel] | Okay.  I have to simply ask you, the—both girls have testified that you washed them—that you washed their genitalia.  True?  Yes? |

10

[Shelton]: Well, yes, but when it—when it came down to their lower body parts, I just—I—I even testified in the first case, it's kind of like the soap and water is running by. It's got to clean it, okay? It's that—that—it's a guy thing, made me nervous, but I would still bathe my grandbabies.

[Counsel]: Did you ever touch either one of those girls in the shower for any other reason other than to wash them?

[Shelton]: No, sir.

[Counsel]: Did you ever touch the genitalia of either one of those girls for your own sexual gratification?

[Shelton]: No, sir. Heavens no.

During cross-examination, Shelton admitted that there were occasions when he and the girls showered naked together. Shelton also acknowledged that he did not reveal that he had showered naked with the girls to the detective who investigated the case; instead, when asked by the detective about the showers, Shelton told the detective he always wore a swimsuit. During questioning, the State emphasized this change in Shelton's story:

[State]: Now, sir, during the course of that conversation with Detective Campbell, do you recall telling him explicitly that you always had a bathing suit on when you would shower with the girls?

[Shelton]: Well, 99—yeah, I did tell him I had a bathing suit on, but—

[State]: You were absolutely certain—

[Shelton]: The girls would come in—let me explain. The girls would come into the shower after swimming. We'd take them in the house. I start bathing them and I had my swimsuit on. You can ask them what color it was. It was bright red. And then as I got them done, I'd be taking my swimsuit off. And I'd let Vicki know, hey, I'm going to take—take my shower now.

11

[State]: Okay. So are you now telling us that you would only remove your swimsuit after they had left the shower?

[Shelton]: Sometimes, yes. Sometimes probably no. This—it's quite a while back.

[State]: Sure. And Detective Campbell was questioning you specifically on what was going on in that shower; right?

[Shelton]: Yes, he was.

[State]: Okay. And at no point did you tell him or to him that you might have been naked during that; right?

[Shelton]: I don't think I did, no.

[State]: And you were crystal clear that you always had your bathing suit on; right?

[Shelton]: 99 percent of the time I did, yes. There were occasions I didn't, but—

[State]: Okay. What I'm getting at is what you told Detective Campbell is different than what you're testifying to here today; right?

[Shelton]: Yes, probably is. To some degree, yes, it is.

[State]: Well, explicitly [sic] about whether or not you were naked, that's different.

[Shelton]: Okay. Okay.

[State]: You also told Detective Campbell that—and you really emphasized that you were extremely embarrassed about this whole deal; right?

[Shelton]: Yes, I am—I'm still very embarrassed about it. This is ludicrous. It's insane.

[State]: Why were you not completely honest with Detective Campbell in making sure to tell him everything that you're telling the jury here today?

[Shelton]: Well, this was a phone conversation and I was at work at the time. I'm dealing with Rex Campbell on the phone. I'm dealing with customers.

12

| [State]: | Well, you took the extra step not just of not talking about it, but to actually make an affirmative representation that you always had your swimsuit on; right? |
|---|---|
| [Shelton]: | Okay. I may have said that at the time. |

Shelton stated that K.R. and K.L. were "[p]robably three and five-ish, four and five-ish, something like that[,]" whenever he showered with them after swimming in the pool, but he also acknowledged that this came to light when they were five and seven. Shelton testified he did not remember anyone, in particular R.S., telling him or Vicki that it was inappropriate for the girls to be in the shower with him. He admitted that he owned a black gun but denied ever showing it to K.R. or threatening her with it.

**G.      Verdict**

The jury found Shelton guilty of continuous sexual abuse of a child and sentenced him to twenty-five years in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

## II.      DISCUSSION

**A.      Standard of Review**

When examining the legal sufficiency of the evidence, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the conviction to determine whether, based on the evidence and reasonable inferences therefrom, any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). In doing so, we give deference to the responsibility of the jury as factfinder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from facts. *Jackson*, 443 U.S. at 319; *Villa v. State*, 514 S.W.3d

13

227, 232 (Tex. Crim. App. 2017); *Johnson v. State*, 419 S.W.3d 665, 671 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). "Deference to the trier of fact extends to inferences drawn from the evidence as long as the inferences are reasonable ones supported by the evidence and are not mere speculation." *Villa*, 514 S.W.3d at 232; *see Johnson*, 419 S.W.3d at 671.

We measure the legal sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge for the case. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc)). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (internal quotation marks omitted). The law as authorized by the indictment must be the statutory elements of the offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000), *overruled in part on other grounds by Gollihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001). That is to say, the hypothetically correct jury charge could not simply quote the language of the statute; rather, it must track the elements of the law specifically alleged by the indictment. *Id.* at 404–05.

## B.    Applicable Law

Texas Penal Code section 21.02 provides that a person commits the offense of continuous sexual abuse against a child if: "(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and (2) at the time

14

of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age." TEX. PENAL CODE ANN. § 21.02(b); *Reckart v. State*, 323 S.W.3d 588, 597–98 (Tex. App.—Corpus Christi 2010, pet. ref'd). The "acts of sexual abuse" alleged by the State were indecency with a child.[5] Here, the State had to present evidence Shelton touched any part of K.L.'s genitals with Shelton's hand or finger, with the intent to arouse or gratify Shelton's sexual desire, twice or more over a period that was thirty days or more. TEX. PENAL CODE ANN. §§ 21.02, 21.11 (West, Westlaw through 2017 1st C.S.).

Texas law provides that the testimony of a child sexual abuse victim is sufficient to support a conviction based on that abuse. *Reckart*, 323 S.W.3d at 598 (citing TEX. CODE CRIM. PROC. ANN. art. 38.07 (West, Westlaw through 2017 1st C.S.); *Ozuna v. State*, 199 S.W.3d 601, 606 (Tex. App.—Corpus Christi 2006, no pet.)). The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult. *Reckart*, 323 S.W.3d at 598; *Ozuna*, 199 S.W.3d at 606; *see Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (en banc). In fact, even if the victim has recanted the allegations, the jury is entitled to credit the earlier allegations and disbelieve the recanted testimony. *Reckart*, 323 S.W.3d at 598 (citing *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi 2008, pet. ref'd)). If a victim recants her outcry, "it is up to the fact finder to determine whether to

---

[5] This is not the exclusive way of committing this offense, but it is the means alleged in the indictment. *See generally* TEX. PENAL CODE ANN. §§ 21.11, 22.021 (West, Westlaw through 2017 1st C.S.). An "act of sexual abuse" under this statute includes aggravated kidnapping, indecency with a child, sexual assault, aggravated sexual assault, burglary (if the actor intended to commit one of the four previously listed offenses), sexual performance of a child, trafficking for sexual purposes, and compelling prostitution. *See id.* § 21.02(c) (West, Westlaw through 2017 1st C.S.).

15

believe the original statement or the recantation." *Saldana*, 287 S.W.3d at 60 (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (en banc)).

In determining the legal sufficiency of the evidence to show Shelton's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear on the record—that the trier of fact resolved any such conflict in favor of the prosecution, and [we] must defer to that resolution." *Couchman v. State*, 3 S.W.3d 155, 163 (Tex. App.—Fort Worth 1999, pet. ref'd) (quoting *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991) (en banc)). Finally, direct evidence and circumstantial evidence are equally capable of supporting a conviction. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("The lack of direct evidence is not dispositive on the issue of the defendant's guilt. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor.").

## C. Analysis

Shelton argues that (1) there is insufficient evidence that he touched K.L.'s genitals for the purpose of sexual gratification, and (2) there is insufficient evidence that he did so on two occasions over a period of more than thirty days.

The specific intent to arouse or gratify the sexual desire of a person can be inferred from conduct, remarks, or all the surrounding circumstances. *Williams v. State*, 305 S.W.3d 886, 891 (Tex. App.—Texarkana 2010, no pet.) (citing *Couchman*, 3 S.W.3d at 163); *Abbott v. State*, 196 S.W.3d 334, 341 (Tex. App.—Waco 2006, pet. ref'd). An oral expression of intent is not required, and a defendant's conduct alone is sufficient to infer intent. *Williams*, 305 S.W.3d at 891; *see Abbott*, 196 S.W.3d at 341; *Couchman*, 3

16

S.W.3d at 163. There is also no requirement that a defendant's penis be erect. *Abbott*, 196 S.W.3d at 341 (citing *Gregory v. State*, 56 S.W.3d 164, 171 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)). Furthermore, intent can be inferred from the defendant's conduct after the incident. *Williams*, 305 S.W.3d at 891 (citing *Couchman*, 3 S.W.3d at 163).

Here, the jury heard testimony from K.R. that Shelton touched K.R.'s and K.L.'s vagina, anus, and chest area while naked in the shower with both girls. During his testimony, Shelton confirmed that the touching occurred but asserted that it was done for hygienic purposes. He points to the fact that his wife was nearby; that there was no evidence that he only showered with the girls when no one was around; that there is no evidence he made the girls touch him; and that there is no evidence he touched the girls "in any manner other than to bathe them." Shelton, however, ignores the other testimony before the jury.

The jury also heard: testimony from K.L. describing Shelton's penis as "big" and that it looked like a "wiener"; testimony from R.S. that the girls did not need any assistance in the shower and that he told Shelton in 2009 that this conduct was not appropriate; testimony from K.R. that the showers happened "like maybe every day" from the summer time until after the start of the school year; testimony from Garza that K.L. evidenced red flags consistent with sexual abuse; and testimony from K.R. that Shelton threatened her with a gun if she told anyone about the showers. K.L.'s description of Shelton's privates may support the inference that his penis was erect, which, although not a requisite of showing intent, may be indicative of an intent fueled by sexual gratification. R.S.'s testimony showed that Shelton committed the same conduct in the past, and, despite

17

R.S.'s warning and instruction to stop, he was now accused of the same conduct years later. Evidence that Shelton committed the same conduct on other occasions is evidence of intent. *Abbott*, 196 S.W.3d at 341 (citing *Morgan v. State*, 692 S.W.2d 877, 881 (Tex. Crim. App. 1985) (en banc) (extraneous offense evidence that defendant had touched complainant in same manner on night before the charged offense and on previous occasions had "indubitable probative value" of defendant's intent)); *see Connell*, 233 S.W.3d at 467 (citing *Ranson v. State*, 707 S.W.2d 96, 97 (Tex. Crim. App. 1986) (en banc) ("Evidence of a common pattern of similar acts is admissible as tending to prove intent.")). Shelton's conduct after the incident, such as the threat he made towards K.R. or the change in his story, may also be indicative of his intent. *See Williams*, 305 S.W.3d at 891; *Couchman*, 3 S.W.3d at 163–64. Furthermore, Garza's testimony supported the allegation that K.L. had been victimized by sexual acts due to the red flags in her behavior, which may have indicated that the showers or conduct of her grandfather were not innocent.

Finally, a defendant's conduct itself is sufficient to infer intent. *Williams*, 305 S.W.3d at 891; *Connell v. State*, 233 S.W.3d 460, 467 (Tex. App.—Fort Worth 2007, no pet.) (citing *C.F. v. State*, 897 S.W.2d 464, 472 (Tex. App.—El Paso 1995, no pet.)); *see Abbott*, 196 S.W.3d at 341. Here, Shelton, a former police officer, showered naked with two young girls multiple times during a period spanning at least several months, and he touched their genitalia and chest area while he showered with them, despite R.S.'s instruction not to do so years earlier. He then falsely told investigators he was never naked in the shower. This was sufficient to infer intent to arouse or gratify the sexual desire of a person when Shelton touched K.L.'s genitals with his hands. *See Williams*,

305 S.W.3d at 891; *Abbott*, 196 S.W.3d at 341 (concluding that the jury could infer defendant's intent to arouse or gratify his sexual desire from his act of touching child's genitals).

The jury determines the credibility of the witnesses and may "believe all, some, or none of the testimony." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (en banc); *Abbott*, 196 S.W.3d at 339. It is the jury that accepts or rejects reasonably equal competing theories of a case. *Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2011); *Abbott*, 196 S.W.3d at 339. Here, the jury could have believed Shelton's version of events that he did not wash the girls with an intent of sexual gratification, or it could have believed that he did have an intent of sexual gratification based on the surrounding circumstances, the testimony from the other witnesses, and his conduct. *See Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013) ("The court of appeals was correct when it [concluded] that the jury should be allowed to choose which evidence is believable."); *Couchman*, 3 S.W.3d at 163. The jury could have reasonably believed that Shelton's assertion that he was merely bathing the girls was a pretext for sexually assaulting them. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981) (concluding that the jury could infer that McKenzie's explanation that he had victim remove her shoes and clothing for an "examination" was a pretext for assault). The evidence is not legally insufficient merely because the factfinder resolved conflicting views of evidence in favor of the State. *Cain*, 958 S.W.2d at 410; *Abbott*, 196 S.W.3d 339. Accordingly, viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Shelton touched K.L.'s genitals with his hand with the intent to arouse or gratify his sexual desire.

*See Jackson*, 443 U.S. at 318–19; *McKenzie*, 617 S.W.2d at 216; *Abbott*, 196 S.W.3d 340–41. Therefore, we reject Shelton's argument that the evidence was legally insufficient to support a finding of this element of the offense.

Shelton also argues that there was insufficient evidence to support a finding that he committed two or more instances of sexual abuse of K.L. during a period longer than thirty days. Although the exact dates of the abuse need not be proven, the offense of continuous sexual abuse of a child does require proof that the last abuse occur on at least the 29th day after the day of the first act. *Smith*, 340 S.W.3d at 48; *see* TEX. PENAL CODE ANN. § 21.02(d); *Williams*, 305 S.W.3d at 890–91. There is also no requirement that the victim herself actually testify as to the dates of abuse. *See Michell v. State*, 381 S.W.3d 554, 561, 564 (Tex. App.—Eastland 2012, no pet.) (noting that city records and the testimony of a homeowner supported the conclusion that the acts of sexual abuse occurred for a period of time in excess of 30 days in duration).

Here, K.R. testified that the naked showers which involved her, Shelton, and K.L. occurred in the summer time and went on into the fall and the school year. K.R. also testified that the showers occurred "like maybe every day." R.S. testified that he first learned Shelton was showering with the girls in 2009 and, even though he did not learn until 2012 that Shelton was naked in the shower, K.R. testified that Shelton had been showering naked with the girls "since way back before the first showering incident [R.S.] was aware of . . . ." Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Shelton committed two or more acts of sexual abuse of K.L. during a period longer than

20

thirty days. *See Jackson*, 443 U.S. at 318–19; *Michell*, 381 S.W.3d at 561, 564.

Therefore, we reject this argument.

We overrule Shelton's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
29th day of August, 2018.